PIERRE GODART AND SUZANNE GODART, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 277–67. Filed March 12, 1969.

*Norman Nadel*, for the petitioners.
*Paul H. Frankel* and *Irving Bell*, for the respondent.

MULRONEY, *Judge:* Respondent determined a deficiency in petitioners' income tax for the year 1962 in the amount of $46,557.28. After certain concessions made by the parties, the sole issue left for decision is whether the admitted loss petitioners suffered when certain stock became worthless in 1962 was a loss on "section 1244 stock."

FINDINGS OF FACT

Some of the facts have been stipulated and they are found accordingly.

Pierre Godart, who will be called petitioner, and Suzanne Godart were husband and wife. They had their legal residence in New York, N.Y., at the time they filed the petition in this proceeding. They filed a joint Federal income tax return for the calendar year 1962 with the district director of internal revenue, New York, N.Y.

Prior to 1960 and during all of the time pertinent to this proceeding, petitioner was the president and principal stockholder of T.S.M. Corp. (TSM), which was engaged in the business of selling textile goods. S. Stroock & Co., Inc. (Stroock) was engaged in the woolen-weaving business. Rusch & Co. was engaged in business as a commercial banker and factor.

On October 25, 1960, petitioner, TSM, and Stroock entered into a "Lease and License Agreement" which was endorsed as approved by Rusch & Co. The purpose of the agreement was to provide for the formation of a new corporation to be owned by petitioner, TSM, and Stroock and to be financed by Stroock and Rusch & Co. which would take over Stroock's textile business. The lease-and-license agreement provided, in part, as follows:

1. Organization of X Company; Stock Subscriptions. Prior to the date of the closing under this Agreement, Stroock, Godart and TSM will cause a new corporation to be organized under the laws of New York ("X Company") with a Certificate of Incorporation substantially in the form of Exhibit A attached hereto and will cause X Company, on or prior to the date of the closing, to issue shares of its common stock in the proportions of one-third to Stroock and two-thirds to Godart and TSM for an aggregate price of $375,000 divided as follows:

1,250 shares for $125,000, Stroock.

2,500 shares for $250,000, Godart and TSM.

and Stroock and Godart each hereby subscribes for and agrees to purchase and pay for such stock. No stock of X Company, other than three directors' qualifying shares shall be issued prior to the closing date.

\* \* \* \* \* \* \*

4. Authorization by Stroock Shareholders. Stroock will proceed as promptly as practicable to call and hold a meeting of its stockholders to obtain authorization pursuant to Section 20 of the New York Stock Corporation Law, of the lease of properties to X Company and, to the extent required, of the other transactions contemplated by this Agreement, and will recommend the approval thereof to its stockholders.

\* \* \* \* \* \* \*

6. Closing. The closing shall take place as soon as practicable, but in any event not later than the first day of the first month after the approval by the stockholders of Stroock of the transactions contemplated hereby, at 11:00 A.M., at the offices of Messrs. Stroock & Stroock & Lavan, 61 Broadway, New York, N.Y. At the closing, (i) the common stock, to the extent not theretofore issued and paid for, and the Notes of X Company will be issued and paid for as provided in Sections 1 and 3 hereof, (ii) the Assets Lease, the Store Lease and the License Agreement will be executed and delivered, and (iii) X Company will pay to Stroock the first installment of rent payable under both such Leases.

Paragraph 27 of the lease-and-license agreement stated that the acts to be performed by the parties were interdependent and that payment for the stock to be sold was to be made simultaneously by petitioner, TSM, and Stroock.

A New York corporation known as the French-American-British Woolens Corp. (FAB) was organized on December 14, 1960. On December 22, 1960, the stockholders of Stroock approved, consented to, and authorized its officers to carry out and effectuate the October 25, 1960 lease-and-license agreement. On December 29, 1960, FAB amended its certificate of incorporation by filing a restated certificate with the secretary of state of the State of New York. It provides, in part, as follows:

THIRD: The amount of the capital stock shall be One Million Dollars ($1,000,000.).

FOURTH: The number of shares of which the capital stock shall consist is ten thousand (10,000) shares of common stock of the par value of One Hundred Dollars ($100.) per share.

The designations, preferences, privileges and voting powers of the shares and the restrictions or qualifications thereof are as follows:

Each holder of any of the shares of the capital stock of the corporation shall be entitled to a pre-emptive right to purchase or subscribe for any unissued stock of any class or any additional shares of any class to be issued by reason of any increase of the authorized capital stock of the corporation of any class, or bonds, certificates of indebtedness, debentures or other securities convertible into stock of the corporation, or carrying any rights to purchase stock of any class, whether said unissued stock shall be issued for cash, property, or any other lawful consideration, and, without limitation of the foregoing, shall have such a pre-emptive right with respect to shares or other securities offered for sale if they (a) are issued or optioned by the Board of Directors to effect a merger or consolidation or for a consideration other than cash; (b) are shares or other securities theretofore reacquired by the corporation after having been duly issued and not restored to the status of authorized but unissued shares by the filing of a certificate under Section 29 of the New York Stock Corporation Law; and (c) are part of the shares or other securities of the corporation originally authorized in its Certificate of Incorporation in excess of the first 3,750 shares which are issued, and are issued, sold or optioned within two (2) years from the date of filing said Certificate; provided, however, that there shall be no pre-emptive right with respect to Restricted Stock Options as defined in the Internal Revenue Code, and shares of capital stock issued pursuant to such Restricted Stock Options provided, that such Restricted Stock Options or the plan pursuant to which the stock option was issued has received the unanimous consent of the entire Board of Directors of the Corporation.

On December 30, 1960, the board of directors of FAB held their first meeting. The minutes of that meeting contain the following resolutions:

The Chairman stated that it was in order to consider the issuance of shares of stock of the Corporation. Upon motion duly made, seconded and carried, it was

RESOLVED, that this Corporation is hereby authorized to issue and sell 1250 shares of its Common Stock, of the par value of $100 per share to S. STROOCK & CO., INC. (including 3 shares, the subscription rights of which have been assigned to it by the Incorporators and Subscribers) at a purchase price of $100 per share; and it was further

RESOLVED, that this Corporation is hereby authorized to issue and sell 1500 shares of its Common Stock, of the par value of $100 per share to TSM Corporation at a purchase price of $100 per share; and it was further

RESOLVED, that this Corporation is hereby authorized to issue and sell 1000 shares of its Common Stock, of the par value of $100 per share to PIERRE GODART, for the purchase price of $100 per share; and it was further

RESOLVED, that on the acceptance of such offers and payment to this Corporation in cash of the respective prices set forth hereinabove, the President or any Vice-President and the Secretary or the Treasurer of this Corporation be and hereby are authorized and directed to execute, issue and deliver to such offerees, respectively, or their respective nominees, certificates representing the number of shares of such Common Stock so offered to such offerees, all such shares to be fully-paid and non-assessable.

That same day the chairman presented to the meeting the lease-and-license agreement of October 25, 1960. Several references to the agreement were made in the minutes and closing of the lease and license of textile properties of Stroock to FAB was held. At this closing, FAB issued its common stock as follows: 1,250 shares to Stroock; 1,500 shares to TSM; and 1,000 shares to petitioner. Petitioner's shares were paid for with a $100,000 check of Rusch & Co. and petitioner immediately endorsed the stock certificate in blank and delivered it to Rusch & Co. as security pursuant to an October 25, 1960, "Pledge of Stock Agreement." From the time of this delivery until at least April 30, 1968, this certificate was held by Rusch & Co.

At the closing on December 30, 1960, FAB delivered to Stroock a letter which began with the following sentence:

Pursuant to section 17 of the Lease and License Agreement, dated October 25, 1960 between you, T.S.M. Corporation and Pierre Godart (the "Lease and License Agreement"), this Company assumes and agrees to pay and discharge all of your obligations accruing after January 1, 1961 under the executory contracts, agreements and orders listed in Schedule A attached hereto.

The license agreement between Stroock and FAB dated as of January 1, 1961, contained the following provisions:

This License Agreement may be terminated by Licensor upon thirty days' written notice to Licensee in the event that any one other than Licensor shall breach or be in default upon any term or provision of * * * (c) the agreement dated October 25, 1960 among Licensor, Pierre Godart and others * * * provided that the event giving rise to the opportunity for any such written notice shall not be cured during the period of such written notice.

The closing report prepared by Debevoise, Plimpton & McLean, Esqs. contained the following language:

The closing of the lease and license of the textile properties of S. Stroock & Co., Inc. ("Stroock") to The French-American-British Woolens Corporation (the "Company") pursuant to the Lease and License Agreement, dated October 25, 1960, among T.S.M. Corporation ("TSM"), Pierre Godart and Stroock took place at the office of Messrs. Stroock & Stroock & Lavan, 61 Broadway, New York 18, New York, at 11 A.M., New York time, on December 30, 1960.

The common stock of FAB became worthless during 1962. Petitioners claimed on their 1962 income tax return a $100,000 long-term capital loss based on the worthlessness of 1,000 shares of FAB. Due to the statutory limitation, only $1,000 of said claim was deducted.

Respondent determined a deficiency in the petitioners' income tax for 1962. No adjustment was made by respondent to the claimed FAB loss. The specific adjustments in the notice of deficiency have now been settled by the parties. However, in their petition the petitioners claimed that the 1,000 shares of common stock issued to Pierre by FAB constituted "1244 stock" and that of their claimed $100,000 loss on FAB stock to the extent of $50,000, said loss constitutes a loss from the sale or exchange of an asset which is not a capital asset. Respondent denies this allegation and it is stipulated "that contention is now the only issue in dispute in this case."

## OPINION

Section 1244 [1] was enacted by Congress to grant preferential treatment that might aid and encourage investment in small business corporations. *Wesley H. Morgan*, 46 T.C. 878 (1966). It provides that a loss on "section 1244 stock" shall be treated as a loss from the sale or exchange of an asset which is not a capital asset. Section 1244(c)(1) defines "section 1244 stock" to be common stock in a domestic corporation if:

(A) such corporation adopted a plan after June 30, 1958, to offer such stock for a period (ending not later than two years after the date such plan was adopted) specified in the plan,

(B) at the time such plan was adopted, such corporation was a small business corporation,

\* \* \* \* \* \* \*

(D) such stock was issued by such corporation, pursuant to such plan, for money or other property (other than stock and securities), and

Section 1244(e) states that "The Secretary or his delegate shall prescribe such regulations as may be necessary to carry out the purposes of this section."

Section 1.1244(c)–1(c)(1), Income Tax Regs., provides that the stock must be issued pursuant to a "written plan * * * to offer only such stock during a period specified in the plan ending not later than two years after the date the plan is adopted." It also provides that the plan "specifically state, in terms of dollars, the maximum amount to be received by the corporation in consideration for the stock to be issued pursuant thereto."

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

Petitioner argues that he qualifies for the special treatment provided by section 1244 because he has met all the requirements imposed by the statute and accompanying regulations. Specifically, he contends that the minutes of FAB's December 30, 1960, board of directors meeting, in which reference is made to the lease-and-license agreement of October 25, 1960, adopted the agreement and, as such, taken together, constitute a "written plan" for the issuance of stock, limited in duration and amount, as required by section 1244.

Respondent argues that petitioner failed to show compliance with the applicable statute and regulations. He argues that (1) the stock was not issued pursuant to a written plan in which the period of the offering to end in 2 years or less was specified in the plan; (2) the alleged plan did not specifically state in terms of dollars the maximum amount to be received by the corporation in consideration for the stock to be issued; (3) the stock was not issued during a period of offering; and (4) the corporation was not as defined by section 1244 a "small business corporation." He states on brief that the principal reason why the FAB stock fails to qualify as "section 1244 stock" is the noncompliance with section 1.1244(c)–1(c)(1), Income Tax Regs., requiring a written plan.

It may well be that a "written plan" could be contained in more than one document if those documents, taken together, present a complete plan. Here the documents consisting of the minutes and the lease-and-license agreement, when considered together, fall far short of presenting a "written plan" such as is required by the statute. The minutes taken together with the agreement "standing alone" are incomplete without further explanation and reference to events outside the writings. Cf. *Bernard Spiegel*, 49 T.C. 527 (1968).

Even if we assume, *arguendo*, that the minutes and the lease-and-license agreement satisfy the requirement that the plan be in writing the other requirements set forth in the statute and regulations as to what the plan is to contain are not satisfied. The cited regulation states the plan must be "to offer only such stock during a period specified in the plan ending not later than two years after the date the plan is adopted." Nowhere in the documents petitioner calls a plan is a period of offering "specified" as required by the statute and respondent's regulation. The only reference in writing or otherwise in the agreement to anything that could be called a period of time in which the stock is to be offered is the statement that: "The closing shall take place as soon as practicable, but in any event not later than the first day of the first month after the approval by the stockholders of Stroock of the transactions contemplated hereby." No specific date, days, months, or years are mentioned. Certainly from this statement

no one can tell when the period of offering is to begin or end. Nowhere in the documents can we ascertain as "specified" in a "written plan" a period of offering which is to end "not later than two years after the date such plan was adopted" as required by section 1244(c).

Petitioner argues that since the stockholders of Stroock met and approved the agreement on December 22, 1960, it was known that the closing date would be January 1, 1961, at the time the agreement was adopted by the corporation and, thus, a period of offering to end in 2 years or less was "specified" in the plan. We cannot agree.

The statute with the regulations clearly states that there is to be a "written plan" and in that "written plan" the period of offering to end in 2 years or less is to be "specified." This is not done here. Only by inference and conjecture and reference to factors and events outside the alleged plan can it be determined that there is such a period of offering.

This case is much like *James A. Warner*, 48 T.C. 49 (1967), affd. 401 F. 2d 162 (C.A. 9, 1968), where the taxpayer argued that a trust agreement referred to in the minutes of the corporation, together with the minutes, constituted a "plan" as required by section 1244. This Court said, "We cannot agree * * * that external computations * * * satisfy the explicit requirements of section 1244(c)(1)(A) that the offering *must* end not later than 2 years after the date of the plan's adoption and that the period in question be 'specified in the plan.' " In the instant case, the only way one can determine that a period of offering to end in 2 years or less even existed is to make external computations and inferences based upon factors outside the alleged "written plan."

This uncertain and indefinite statement in the agreement as to a period of offering does not satisfy the requirement that a period of offering be "specified in the plan." Such an uncertain, indefinite, and incomplete statement is far too inadequate to satisfy section 1244. See *Bernard Spiegel, supra; James A. Warner, supra;* and *Wesley H. Morgan, supra.*

Even if we assume that there was a period of offering to end in 2 years or less "specified" in the documents petitioner argues constitute a "plan," the petitioner would still fail because section 1.1244(c)–1(c)(1), Income Tax Regs., requires that "The plan must specifically state, in terms of dollars, the maximum amount to be received by the corporation in consideration for the stock to be issued pursuant thereto." This was not done. FAB could have issued additional shares of stock after the initial sale of 3,750 shares. Petitioner argues that there was a statement in the agreement to the effect that "no stock of X Company [FAB], other than three directors' qualifying shares shall be issued prior to the closing date" and, thus, the maximum amount to

be received was specified in terms of dollars. We cannot agree. This statement only limits sales prior to the closing date and does not prevent the additional 6,250 shares of stock of FAB that was authorized on December 29, 1960, from being sold at any price on the closing date and, thus, within what petitioner claims to be the period of offering. In other words, the maximum amount to be received for the stock issued under the plan during the period of offering was not specified in the agreement as required by section 1.1244(c)–1(c) (1), Income Tax Regs.

The cited regulation also states: "To qualify, the stock must be issued during the period of the offer, which period must end not later than two years after the date the plan is adopted." We have held the alleged plan is deficient in that it fails to state a specified period of offer. This also means the stock fails to qualify because obviously it was not issued "during the period of the offer."

As far as we can tell from the record there was never, in fact, any issuance of stock pursuant to an offering. There only appears to have been a simple stock purchase. The minutes and agreement simply reflect an agreement to sell stock. The resolutions of the corporation only show that the corporation agreed to issue and sell a certain number of shares to certain individuals.

Furthermore, section 1244(c) (1) (B) requires that in order for stock to qualify as "section 1244 stock" it must be the stock of a "small business corporation." Section 1244(c) (2) defines a "small business corporation" and provides therein that at the time of the adoption of the plan, the aggregate amount which *may* be offered under the plan cannot exceed $500,000. In this case, for the same reason the maximum amount was not specified, the aggregate amount which *might* have been offered did in fact exceed $500,000. There were 10,000 shares with a par value of $100 per share authorized by the corporation and while only 3,750 shares were issued the additional 6,250 shares could and might have been offered during the so-called specified period of offering; therefore, FAB was not a "small business corporation."

We hold that the stock of FAB is not "section 1244 stock" and the loss incurred by petitioner in 1962 on worthless stock of FAB fails to qualify as a loss to which section 1244 applies. We sustain respondent's position.

*Decision will be entered under Rule 50.*