WILLIAM O. HAYDEN AND WILDA JOY HAYDEN, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6177–66—6180–66.    Filed September 30, 1969.

[1] Cases of the following petitioners are consolidated herewith : Estate of Alta P. Hayden, Deceased, William O. Hayden, Executor, and O. M. Hayden, William O. Hayden, Attorney in Fact, docket No. 6178–66 ; Jack P. Hayden and Gene M. Hayden, docket No. 6179–66 ; and Daniel L. Hayden, docket No. 6180–66.

*William M. Frazier*, for the petitioners.
*Rodney G. Hayworth*, for the respondent.

1118

OPINION

The initial issue presented for decision is whether Spectacular Shows, Inc., adopted a plan meeting the requirements of section 1244(c)(1)(A) and the underlying regulations thereto. If that issue is determined in the affirmative, we must further decide whether all or any part of the stock issued to petitioners by Spectacular Shows, Inc., was issued pursuant to such plan. There is no question as to the other statutory requirements with respect to section 1244 stock.

Section 1244, the pertinent portions of which are set forth in the footnote below,[4] was enacted to encourage the flow of new funds into

---

[4] SEC. 1244. LOSSES ON SMALL BUSINESS STOCK.

(a) GENERAL RULE.—In the case of an individual, a loss on section 1244 stock issued to such individual or to a partnership which would (but for this section) be treated as a loss from the sale or exchange of a capital asset shall, to the extent provided in this section, be treated as a loss from the sale or exchange of an asset which is not a capital asset.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(c) SECTION 1244 STOCK DEFINED.—

(1) IN GENERAL.—For purposes of this section, the term "section 1244 stock" means common stock in a domestic corporation if—

(A) such corporation adopted a plan after June 30, 1958, to offer such stock for a period (ending not later than two years after the date such plan was adopted) specified in the plan.

(B) at the time such plan was adopted, such corporation was a small business corporation,

(C) at the time such plan was adopted, no portion of a prior offering was outstanding,

(D) such stock was issued by such corporation, pursuant to such plan, for money or other property (other than stock and securities), and

(E) such corporation, during the period of its 5 most recent taxable years ending before the date the loss on such stock is sustained (or if such corporation has not been in existence for 5 taxable years ending before such date, during the period of its taxable years ending before such date, or if such corporation has not been in existence for one taxable year ending before such date, during the period such corporation has been in existence before such date), derived more than 50 percent of its aggregate gross receipts from sources other than royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities (gross receipts from such sales or exchanges being taken into account for purposes of this subparagraph only to the extent of gains therefrom); except that this subparagraph shall not apply with respect to any corporation if, for the period referred to, the amount of the deductions allowed by this chapter (other than by sections 172, 242, 243, 244, and 245) exceed the amount of gross income.

Such term does not include stock if issued (pursuant to the plan referred to in subparagraph (A)) after a subsequent offering of stock has been made by the corporation.

(2) SMALL BUSINESS CORPORATION DEFINED.—For purposes of this section, a corporation shall be treated as a small business corporation if at the time of the adoption of the plan—

(A) the sum of—

(i) the aggregate amount which may be offered under the plan, plus

(ii) the aggregate amount of money and other property (taken into account in an amount, as of the time received by the corporation, equal to the adjusted basis

small businesses. H. Rept. No. 2198, 85th Cong., 2d Sess., p. 4 (1959), 1959–2 C.B. 711. In effectuating this purpose, section 1244 provides ordinary-loss treatment where the original holder of what is termed "section 1244 stock" realizes a loss on such stock.

Section 1244(c)(1) supplies the definition of "section 1244 stock." Initially, it provides that the term "section 1244 stock" means common stock in a domestic corporation if such corporation adopted a plan after June 30, 1958, to offer such stock for a specified period ending not later than 2 years after the date such plan was adopted. Sec. 1244(c)(1)(A).

Section 1244(e) provides that the Secretary or his delegate shall prescribe such regulations as may be necessary to carry out the purposes of this section. Section 1.1244(c)–1, Income Tax Regs., as promulgated pursuant to this authority provides, in pertinent part, as follows:

Sec. 1.1244(c)–1. Section 1244 stock defined.

(a) *In general.* In order that stock may qualify as section 1244 stock the requirements described in paragraphs (b) through (h) of this section must be satisfied. * * *

(b) *Common stock.* Only common stock, either voting or nonvoting, in a domestic corporation may qualify as section 1244 stock. * * *

(c) *Written plan.* (1) The common stock must be issued pursuant to a written plan adopted by the corporation after June 30, 1958, to offer only such stock during a period specified in the plan ending not later than two years after the date the plan is adopted. * * * The plan must specifically state, in

---

to the corporation of such property for determining gain, reduced by any liabilities to which the property was subject or which was assumed by the corporation at such time) received by the corporation after June 30, 1958, for stock, as a contribution to capital, and as paid-in surplus,

does not exceed $500,000 ; and

  (B) the sum of—

    (i) the aggregate amount which may be offered under the plan, plus

    (ii) the equity capital of the corporation (determined on the date of the adoption of the plan),

does not exceed $1,000,000.

For purposes of subparagraph (B), the equity capital of a corporation is the sum of its money and other property (in an amount equal to the adjusted basis of such property for determining gain), less the amount of its indebtedness (other than indebtedness to shareholders).

  (d) SPECIAL RULES.—

    (1) LIMITATION ON AMOUNT OF ORDINARY LOSS.—

      (A) CONTRIBUTIONS OF PROPERTY HAVING BASIS IN EXCESS OF VALUE.—If—

        (i) section 1244 stock was issued in exchange for property,

        (ii) the basis of such stock in the hands of the taxpayer is determined by reference to the basis in his hands of such property, and

        (iii) the adjusted basis (for determining loss) of such property immediately before the exchange exceeded its fair market value at such time,

then in computing the amount of the loss on such stock for purposes of this section the basis of such stock shall be reduced by an amount equal to the excess described in clause (iii).

\*      \*      \*      \*      \*      \*      \*

  (e) REGULATIONS.—The Secretary or his delegate shall prescribe such regulations as may be necessary to carry out the purposes of this section.

terms of dollars, the maximum amount to be received by the corporation in consideration for the stock to be issued pursuant thereto. * * *

Thus, by virtue of the above-quoted provisions of section 1244(c) (1) (A) and underlying regulations, there are presented the following initial requirements for qualification under section 1244:

1. The corporation must adopt a written plan sometime after June 30, 1958, to offer only common stock.

2. Such plan must specifically state, in terms of dollars, the maximum amount to be received by the corporation in consideration for the stock to be issued pursuant thereto.

3. A period of time must be specified for the offering of stock, such period ending not later than 2 years after the date of the adoption of the plan.

The regulation's requirement of having the plan in writing so as to evidence tangibly the intent to fall within the provisions of section 1244 finds direct support in the legislative history of section 1244. The House committee report provides, *inter alia*, that "Such plan jury could properly find or infer, beyond a reasonable doubt,' that (1959), 1959-2 C.B. 714. This requirement of the regulation has been specifically upheld by us as a reasonable interpretation of section 1244. *Wesley H. Morgan*, 46 T.C. 878 (1966).

In our determination as to whether Spectacular Shows, Inc., adopted a valid written plan, we first examine the corporate minutes of the organization meeting held on May 21, 1960. The minutes record the adopted bylaws of the corporation which designate, *inter alia*, that the capital stock of the corporation shall be such as is set out in the certificate of incorporation. The original, May 19, 1960, certificate of incorporation, although it is not specifically stated therein, makes it quite clear that the incorporators intended to issue only 5,000 shares of common stock at a par value of $1 each; the only stock subscribed for by the incorporators is specifically stated to be common stock; we cannot find any possible way to interpret the certificate of incorporation as authorizing the issuance of preferred stock.

As stated in the original certificate of incorporation, the total authorized capital stock of the corporation was $5,000, to be divided into 5,000 shares at the par value of $1 each. Without anything else, it might be in the realm of speculation for us to determine whether the 5,000 shares were intended to be common stock or preferred stock; but there are further indications in the certificate which clarify this matter. In the portion of the certificate regarding stock subscriptions, it is designated that each of the three original incorporators was subscribing to 350 shares of common stock. That part of the subscription information regarding preferred stock for each of the incorporators

was first typed in with the designation of "none." At some time subsequent to the typing in of the response of "none," the subscription information in the certificate relating to preferred stock was crossed out. Under that portion of the certificate regarding stock subscriptions there was a further informational request that the space below be used for any statements as to stock without par value, or where more than one class of stock was to be issued, or where one or more series was to be issued within a class of stock. The space below this request was left blank. All of these indications make it quite obvious that the original certificate of incorporation authorizes the issuance of only 5,000 shares of common stock and that no preferred stock was to be issued.

Referring back now to the minutes of the organization meeting on May 21, 1960, we find that there was some discussion by the board of directors specifically indicating their intent to adopt a plan to fall within the provisions of section 1244 and that all the stock being issued by the corporation was to be in accordance with this plan. The "plan" to which the minutes make reference is found in a handwritten document, dated May 21, 1960, which was prepared and signed by William Hayden as president of Spectacular Shows, Inc. The document provides as follows:

Spectacular Shows, Inc.

All of the attached stock is issued under Sec. 1244 and the maximum amount to be issued under the plan will be 5,000 shares at $1.00 per share.

All of this stock (5,000 shares) will be issued within 2 years and by no later than May, 1962.

Upon reviewing the minutes of the May 21, 1960, meeting, the original certificate of incorporation, and the handwritten document dated May 21, 1960, it is our conclusion that these documents, when taken together, present a written plan meeting the requirements of section 1244(c)(1)(A) and underlying regulations thereto:

1. At some time after June 30, 1958, the corporation did adopt a written plan, as embodied in these documents, to offer only common stock to its shareholders.

2. Such plan specifically stated, in terms of dollars, 5,000 shares at $1 per share, the maximum amount to be received by the corporation in consideration for the stock to be issued pursuant thereto.

3. A period of time which was to end no later than 2 years after the date of the adoption of the plan was specified therein.

In other section 1244 cases involving a written plan comprised of several documents, this Court has held that such documents would not constitute a valid plan if, when taken together, they would still be incomplete without further reference to computations and events out-

side of them. See *Pierre Godart*, 51 T.C. 937 (1969) ; *Bernard Spiegel*, 49 T.C. 527 (1968) ; *James A. Warner*, 48 T.C. 49 (1967), affd. 401 F. 2d 162 (C.A. 9, 1968). Such is not the situation in the case before us. No computation or reference has to be made outside of the minutes of May 21, 1960, and the two writings to which it makes reference. Within these documents, the corporation has clearly evidenced its intent to comply with the requirements set out in the provisions of section 1244(c) (1) (A) and the regulations. Sec. 1.1244(c)–1, Income Tax Regs.

Respondent contends that by virtue of the language contained in the May 21, 1960, handwritten document that "All of this stock * * * will be issued within 2 years and by no later than May, 1962," it is therefore possible for the stock to be issued at a time subsequent to 2 years after the adoption of the plan. He interprets the language "no later than May, 1962" as meaning no later than May 31, 1962, which is more than 2 years after May 21, 1960, when the overall plan was adopted. We cannot agree with respondent's interpretation of this language. When "no later than May, 1962" is read in context with the earlier part of the same sentence which provides that "All of this stock * * * will be issued within 2 years," and the document in which this sentence appears is dated May 21, 1960, we have to conclude that the only reasonable interpretation thereof dictates the finding that May 1, 1962, which would be within 2 years after the adoption of the plan, was the final date contemplated for the issuance of stock, rather than May 31, 1962, as urged by respondent. Even if it were to be concluded that May 1, 1962, is not the correct interpretation of the phrase "no later than May, 1962" we would conclude that the plan clearly provided that the stock be issued within 2 years after May 21, 1960, the date of its adoption, and therefore complied with that requirement of section 1244.

After complying with section 1244(c) (1) (A) and the underlying regulations with respect to the adoption of a plan for the issuance of "section 1244 stock," there is a further requirement in section 1244(c) (1) (D) that the corporation issue the stock pursuant to such plan for money or property other than stock and securities. Section 1.1244(c)–1 of the Income Tax Regulations provides, in pertinent part, as follows:

Sec. 1.1244(c)–1.    Section 1244 stock defined.

\*        \*        \*        \*        \*        \*        \*

(c)  Written plan. * * *

(2)  To qualify, the stock must be issued during the period of the offer, which period must end not later than two years after the date the plan is adopted. Stock which is subscribed for during the period of the plan but not issued during such period cannot qualify as section 1244 stock. * * *

(3)  Stock subscribed for prior to the adoption of the plan, including stock subscribed for prior to the date the corporation comes into existence, may be

considered issued pursuant to a plan adopted by the corporation if the stock is not in fact issued prior to the adoption of such plan.

(4) Stock isssued for a payment which, alone or together with prior payments, exceeds the maximum amount that may be received under the plan, is not considered issued pursuant to the plan, and none of such stock can qualify as section 1244 stock. * * *

Respondent contends that none of the stock issued by Spectacular Shows, Inc., was issued pursuant to the plan adopted on May 21, 1960, while petitioners, on the other hand, contend that all of the stock was issued pursuant to such plan. We will deal initially with those shares of stock which were issued upon the preincorporation subscriptions of William, Jack, and Daniel Hayden, three of the four petitioners.

Upon review of the facts surrounding the physical issuance of the stock originally subscribed for by William, Jack, and Daniel Hayden prior to the incorporation of Spectacular Shows, Inc., we conclude and hold, as we did under similar facts in *Wesley H. Morgan, supra,* that the above-named petitioners each became the owners of 350 shares of the stock on May 19, 1960, the date of the issuance of the certificate of incorporation. Their subscriptions were accepted by the corporation upon the date of the issuance of its certificate of incorporation and, accordingly, they are to be treated as the owners of this stock on that date. We view as insignificant the fact that William paid the remaining balance due on his subscription agreement subsequent to the date of incorporation, having previously paid $100 on April 16, 1960.

The issuance of the certificates was not required to constitute the three brothers stockholders nor was the date of delivery controlling. The evidence of record here convinces us that they became the owners of the preincorporation shares prior to the adoption of the plan on May 21, 1960. We conclude that petitioners, William, Jack and Daniel Hayden, became owners of 350 shares apiece, by virtue of their earlier subscriptions, upon the date of the issuance of the certificate of incorporation, May 19, 1960. This stock therefore, for purposes of section 1244(c)(1)(D), is considered to have been issued on that same date. *Wesley H. Morgan, supra.* In that the section 1244 plan was adopted on May 21, 1960, 2 days after the stock was issued, we must also conclude that this stock was not issued pursuant to the plan as required by section 1244(c)(1)(D).[5] Petitioners, William, Jack, and

---

[5] Sec. 1.1244(c)–1(c)(3) of the Income Tax Regs. provides as follows: "Stock subscribed for prior to the adoption of the plan, including stock subscribed for prior to the date the corporation comes into existence, may be considered issued pursuant to a plan adopted by the corporation if the stock is not in fact issued prior to the adoption of such plan." This regulation has been interpreted as referring to a stock subscription conditioned upon the adoption of a plan. *Wesley H. Morgan,* 46 T.C. 878, 891 (1966). Petitioners have neither called our attention to this regulation, nor supplied us with any evidence to call for its application. Therefore, we did not consider it in reaching our conclusion. In light of our holding that the subscription shares issued on May 19, 1960, the date of incorporation, they would not qualify under this provision of the regulations because they in fact issued prior to the adoption of the plan on May 21, 1960.

Daniel Hayden, are therefore not entitled to deduct the losses suffered by them on their initial subscription shares, 350 shares each, as a loss from the sale or exchange of an asset, which is not a capital asset, under section 1244(a). *Wesley H. Morgan, supra.*

Petitioners have urged, citing a West Virginia case decided in 1895, that Spectacular Shows, Inc., did not come into existence until the organization meeting on May 21, 1960, and that the stock was not issued until that date because theretofore no officers were elected who could sign stock certificates. This case, *Greenbrier Industrial Exposition v. Squires*, 40 W. Va. 307, 21 S.E. 1015 (1895), deals with the not too relevant question of whether a subscriber, by virtue of his post-incorporation actions, was estopped to deny his liability as a subscriber. Neither the facts nor the legal issue of that case have any direct bearing on the case before us; we view it as clearly distinguishable and not at all in point. It will suffice to point out that section 31–1–8 of the West Virginia Code provides that a corporation shall exist from the date of the issuance of its certificate of incorporation. We have already stated our reasons for rejecting the argument that stock is not issued until certificates therefor are signed and delivered, and need not repeat them again here. See *Wesley H. Morgan, supra* at 890.

Respondent and petitioners are also in disagreement as to whether those shares of stock which were paid for between July 5, 1960, and November 29, 1961, were issued pursuant to a valid plan under section 1244(c)(1)(A) and regulations thereto. On November 30, 1961, certificates for the following numbers of shares were issued and delivered to each of the petitioners: William Hayden—9,537, Jack Hayden—7,691, Daniel Hayden—5,836, O. M. Hayden—1,300. The number of these shares corresponded to the total amounts, excluding the initial subscription payments, that were paid by each of the petitioners to or on behalf of the corporation as it needed the funds during the period. The intent of the petitioners, as we have held in our Findings of Fact, was that each of their payments made to or on behalf of the corporation was to represent an equity investment in the stock of the corporation; stock certificates, evidencing these capital investments were eventually to be issued and delivered to each of the petitioners.

Respondent contends that *Wesley H. Morgan, supra*, which also dealt with two separate issuances of stock, is controlling here with respect to the November 30, 1961, stock delivery. In effect he contends that all stock except the initial 1,050 shares was issued on November 30, 1961, when the second group of certificates were delivered as set forth above. This position is hardly consistent with his stand as to the pre-incorporation subscription shares which he insists were issued before certificates therefor were delivered. This time we think he is wrong.

In *Morgan*, petitioners were partners in a partnership which owned the stock in two corporations. A third corporation, called Junction Drilling Co., was formally organized on March 2, 1961, in which the petitioners' partnership was the controlling stockholder. A written plan meeting the requirements of section 1244 was adopted by Junction on April 3, 1961. From its commencement of business in March 1961, to September of 1961, Junction operated at a loss. During this period, Junction became indebted to the other two corporations controlled by the partnership. On September 15, 1961, the directors of Junction adopted a resolution of dissolution of the corporation to pay off its debts. Junction needed additional funds in the approximate amount of $25,726 to pay off its remaining outstanding debts, including notes payable to the other two corporations in the face amount of $15,000 each. At this time, on or about September 26, 1961, the partnership paid $21,103 to Junction, and other shareholders also made payments to the corporation. The corporation then paid its remaining debts, including the notes payable to the other two corporations. On this same date, 21,103 shares of stock were issued to the partnership.

On September 28, 1961, the secretary of state of Colorado issued a certificate of dissolution of Junction. In holding that the 21,103 shares of stock could not qualify for ordinary-loss treatment under section 1244, we made the following statement:

But the real basis for our conclusion on this issue is that we do not believe the $21,103 was paid for the purchase of stock of Junction. It may well have been a contribution to the capital of Junction to permit it to pay off all of its creditors, including the two corporations partially owned by Petroleum. Such altruism on the part of stockholders of a closely held corporation is not unheard of. But we will not accept the argument that it was paid for stock which was admittedly worthless at the time of issuance and which would represent an additional interest in a corporation which was insolvent and was already in the process of dissolution. The only reason this would be done would be to create a tax deduction. We cannot agree that this payment resulted in a loss on section 1244 stock, whether or not the stock purportedly issued technically qualified as section 1244 stock; and we so hold. * * *

We think that the facts surrounding the November 30, 1961, stock in the case before us are clearly distinguishable from those in *Morgan* regarding a second issuance of stock on September 26, 1961. The only factual similarity between the two is that on the date of the *physical delivery* of the stock certificates, such stock was worthless. It was the *Morgan* case itself which established that the date of the physical delivery of the stock certificates is irrelevant in determining when the stock was issued for purposes of section 1244.

With respect to the question of when, in a postincorporation situation, stock is considered to be issued for purposes of section 1244,

this Court has looked to the dates when the stock was actually paid for.[6] In *Morgan*, the stock was paid for on or about September 26, 1961, when the stock itself was admittedly worthless and when the corporation was in the process of dissolution. A good part of the September 26, 1961, payments in *Morgan* were eventually repaid by Junction to the two other corporations controlled by Petroleum, the partnership in which the petitioners therein were partners. In essence, it was nothing more than a person's taking money from one pocket and putting it into another. Such is not the situation in the case before us. The petitioners here were making stock payments from the early inception of the corporation's business, as contrasted with a lump-sum payment during dissolution. By July 28, 1960, more than 1 year and 4 months before the dissolution of the corporation, petitioners had made stock payments to the corporation of $5,000, the maximum amount to be issued pursuant to the adopted plan of May 21, 1960.[7] Although some of the payments occurring between September and November of 1961 might be subject to some doubts, and certainly the payments of November 27 and 29, 1961, were paid for worthless stock so as not to qualify as section 1244 stock under the rationale of *Wesley H. Morgan, supra*, we think that the other payments were made as capital advances, investments in stock if you will, to keep the business going and not to provide funds for the purposes of dissolution. None of the payments were to eventually end up in any other corporations in which the petitioners had any ownership interests. The facts of record here are clearly distinguishable from the facts involving the second issuance of stock in *Wesley H. Morgan, supra*.

We conclude and hold that the first 5,000 shares of stock paid for after incorporation, beginning July 5, 1960, was issued pursuant to the adopted plan of May 21, 1960, which had a maximum dollar limit of $5,000. Any stock issued above the $5,000 maximum limits of the May 21, 1960, plan, cannot, obviously, be considered as having been issued pursuant to that plan. Sec. 1.1244(c)–1(c)(4), Income Tax Regs. If such other stock is to be treated as "section 1244 stock," it must have issued pursuant to another valid plan adopted at some time subsequent to the issuance of the 5,000 shares pursuant to the plan of May 21, 1960.

---

[6] *Herbert S. Lichtenberg,* T.C. Memo. 1967–130. In other cases not involving section 1244, but where the question was one of when the taxpayer became the beneficial owner of stock, the Court looked to the date the stock was paid for as opposed to the date of physical issuance of stock certificates. See, e.g., *W. F. Marsh,* 12 T.C. 1083 (1949).

[7] We have already determined that the stock resulting from the initial $350 stock subscriptions were not issued pursuant to the plan; accordingly, we have not included those amounts in computing the first $5,000 of stock which should be considered as having been issued pursuant to the plan.

A few months after incorporation, a special meeting of the stockholders of Spectacular Shows, Inc., was called on September 26, 1960, to consider increasing the authorized capital stock of the corporation from 5,000 to 50,000 shares of common stock, at a par value of $1, per share. The corporation's accountant recommended that this be done because he realized that the stockholders' advances exceeded authorized capital stock. A resolution to this effect was adopted by the board of directors. The minutes of this meeting also record discussion about section 1244 but what exactly was discussed is not clear, this portion of the minutes being as follows:

It was brought out that at the organization meeting, May 19, 1960, that all stock issued would have to be issued in accordance with Section 1244–IRC and the amendment would be following the general plan of stock issued in accordance with the provisions of section 1244–IRC, as adopted at the organization meeting of May 19, 1960.

There was no further mention of a plan and no resolution to this effect. No time limit for the issuance of the additional shares was specified, however, nor was any accompanying document executed, as in the original plan, to specify any details of a plan under section 1244. On October 14, 1960, the secretary of state of West Virginia authorized an increase in the capital stock of the corporation to 50,000 shares, at a par value of $1 per share.

It should initially be pointed out that between July 28, 1960, by which time the first $5,000 of stock had been effectively issued pursuant to the original plan, and September 26, 1960, when the stockholders met to amend the articles of incorporation, $2,052.46 of payments were made; the stock purchased by these payments cannot be considered as having been issued pursuant to any plan and, accordingly, cannot qualify for ordinary-loss treatment under section 1244.

Section 1.1244(c)–1(h)(2) of the income tax regulations provides *inter alia*, that a corporation may withdraw a plan and adopt a new plan to issue stock. The new plan, of course, must meet the same requirements under section 1244(c)(1)(A) and regulations thereto as would an initial plan.

If it be deemed a plan at all, we think, however, that the minutes of September 26, 1960, do not adequately comprise a qualifying written plan within the requisites set out by section 1244(c)(1)(A) and the underlying regulations. These minutes do nothing more than record a discussion of the board of directors to the effect that the future issuances of stock, under an increased authorized capital stock, would be in accordance with the provisions of section 1244 as was done under the initial plan. The minutes do not specify the maximum amount, in terms of dollars, to be received for the stock to be issued, nor is any time period, with an upper limit of 2 years, mentioned. This resolution

in the minutes to increase the authorized capital of the corporation to 50,000 shares, at a par value of $1 per share, does not itself represent a specification of the maximum amount, in terms of dollars, to be received for the stock to be issued. These minutes together with the subsequent amendment to Spectacular's certificate of incorporation do not constitute a "plan" which meets the specifications of section 1244. *Pierre Godart, supra; Bernard Spiegel, supra; James A. Warner, supra.*

We must conclude that petitioners have failed to establish that a plan meeting the requirements of section 1244(c)(1)(A) and the regulations was adopted subsequent to May 21, 1960, to qualify the increased capital stock covered by the amendment voted on September 21, 1960, as section 1244 stock. Accordingly, we hold that the stock issued subsequent to the issuance of 5,000 shares paid for by the first advances totaling $5,000 made to operating capital after May 21, 1961, was not section 1244 stock and therefore not subject to ordinary-loss treatment under that section. There was no valid plan under section 1244(c)(1)(A) save and except the first one.

*Decisions will be entered under Rule 50.*