*Decision will be entered under Rule 50.*

JOHN H. RICKEY AND LORRAINE C. RICKEY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5426–67. Filed March 31, 1970.

*Paul E. Anderson, C. Henry Veit,* and *William E. Anderson, Jr.,* for the petitioners.

*Martin A. Schainbaum* and *Edward B. Simpson,* for the respondent.

684

692

OPINION

*Issue 1.  Use of Installment Method*

The first issue before us is whether the payments received by petitioner in the year of sale (1962) for his stock in Studio Inn and

Enterprises exceeded 30 percent of the stocks' selling price. If we find that they did, petitioner is precluded from reporting the gain realized from the sale of his Studio Inn and Enterprises stock on the installment method.[2]

In arriving at our determination of this issue, we must first determine whether the payment of $193,541.48 due petitioner on January 2, 1963, was actually received in 1962 (the year of sale). If we conclude that it was, petitioner received payments in the year of sale totaling $507,043.48 which exceeds 30 percent of the selling price of his stock.[3]

Respondent contends that since this payment was to be offset against the amount petitioner owed Hyatt, this resulted in a cancellation of Hyatt's obligation for this payment, and that this constituted a payment to petitioner in the year of sale of $193,541.48. Petitioner does not dispute the fact that the payment of $193,541.48 was offset against the amount he owed Hyatt, nor that the offset was provided for in the contract. His position is that the offset occurred on January 2, 1963, and since that was the due date of the $193,541.48 payment, the offset could not have occurred prior to that date.

As originally contemplated, Hyatt was to purchase the hotel from Studio Inn and the restaurant from Enterprises. Under this arrangement, however, petitioner and the Marstens were not able to take advantage of the installment method. Therefore, so that petitioner and the Marstens could report their gain on the installment method, the sale was recast in the form of a stock sale. Because Hyatt was unwilling to purchase all of the assets underlying the stock of both corporations, some arrangement had to be made whereby the unwanted assets were pulled out of the corporations prior to the purchase of the stock by Hyatt. Consequently, petitioner agreed to purchase these unwanted assets. Evidently, petitioner did not have the necessary cash available with which to purchase these assets, so petitioner and Hyatt agreed that accounts receivable would be set up on the books of Studio Inn and Enterprises, respectively, for the amount petitioner owed for these assets. After providing in the contract of sale for offsetting these accounts receivable against any indebtedness of Studio Inn and Enterprises to petitioner, re-

---

[2] Sec. 453(b)(2)(A)(ii) provides that the installment method is available in the case of a casual sale of personalty only if in the year of the sale "the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price."

[3] This result is reached whether the contract of sale constituted one sale of stock or two sales of stock. The percentage of payments to selling price in both instances is reflected in our Findings of Fact.

spectively, provision was made that the remaining indebtedness of petitioner would be paid as follows:

first, by the application of the balance of the 29% installment of purchase price * * * ; second, by the application of all installments of purchase price payable to such stockholder for his stock due on or after January 1, 1963; and third, by credit against amounts becoming due on * * * [petitioner's] promissory note.

Under the terms of the contract Hyatt was to pay petitioner 4½-percent interest only on the promissory note, while petitioner was not obligated to pay interest on his indebtedness. However, after the audit was conducted and it was first learned that petitioner owed Hyatt $466,398.83 and that this exceeded the non-interest-bearing payments Hyatt owed petitioner, a supplemental agreement was entered into on August 29, 1962, whereby petitioner agreed to pay 5½-percent interest on $107,341.11. This amount was arrived at, in part, by deducting the payment of $193,541.48 from the total indebtedness of petitioner.

We think it clear that the payment of $193,541.48 was effectively received by petitioner in 1962 (the year of sale). We reach this conclusion first by looking to the substance of the transaction rather than the form in which it was cast. As we view the transaction, petitioner deferred payment of that portion of the non-interest-bearing payments which exceeded 29 percent of the selling price, to wit, $193,541.48, solely for the purpose of altering his tax liability. While we recognize that a taxpayer may deliberately arrange the terms of a sale so he will receive less than 30 percent of the sale price in the year of sale, nevertheless to so qualify the arrangements must have substance and reflect the true situation rather than being merely the formal documentation of the terms of the sale. Here petitioner did this with the knowledge that, by virtue of the provision requiring this amount to be offset against his indebtedness to Hyatt, he would never receive this payment in the form of cash.[4] As far as Hyatt was concerned, its obligation to pay petitioner $193,541.48 consisted entirely of making a bookkeeping entry on January 2, 1963.

The formalism engaged in by petitioner and Hyatt solely for the purpose of permitting petitioner to report his gain on the installment method cannot and will not be given effect, for as the Supreme Court stated in *Commissioner* v. *Court Holding Co.*, 324 U.S. 331, 334 (1945):

---

[4] By purchasing the assets Hyatt did not want through the establishment of accounts receivable it was obvious from the beginning that Hyatt would never be called on to pay the $193,541.48. Petitioner retained possession of assets worth more than that at all times.

To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress.

We therefore hold that the substance and economic reality of the transaction was that a portion of petitioner's indebtedness to the corporations for assets retained, and thus to Hyatt, was effectively discharged by application of Hyatt's indebtedness to petitioner in the amount of $193,541.48 in 1962, and constituted a payment to petitioner in that year under section 453((b)(2)(A)(ii).

Our conclusion above is supported by an earlier decision of this Court. In *James Hammond*, 1 T.C. 198 (1942), the taxpayer sold shares of stock for a total price of $965,000, receiving in the year of sale a cash payment of $74,000 from the vendee. In addition, he received from a creditor, who was also a party to the agreement of sale, cash in the amount of $280,000 and the cancellation of a prior indebtedness in the sum of $150,000, for which petitioner gave the creditor his notes for $430,000 payable only from the payments to be made by the vendee. On those facts we held that the taxpayer had immediately received the benefit of $504,000 as a result of the sale agreement.

Our conclusion is also supported by the recent case of *United States* v. *Ingalls*, 399 F. 2d 143 (C.A. 5, 1968). There Ingalls entered into an agreement in compromise of litigation and dispute whereby he sold his employment contract to his employer for $228,360 payable in equal installments of $22,836 for the next 10 years. It so happened, however, that Ingalls owed his employer the amount of $228,360. He agreed to pay off his $228,360 indebtedness also in installments of $22,836 over the same period. A provision in the agreement permitted the employer to make payments to Ingalls by crediting such against the amount he owed. The Fifth Circuit held that the substance of the agreement was the discharge of indebtedness due the employer by Ingalls at the time of the making of the agreement.

Petitioner argues that the above-cited cases are distinguishable for the following reasons: (1) Mutual debts do not automatically cancel each other; (2) the debts, here, were not made in consideration of each other; (3) under the terms of the contract he had continuing obligations, a breach of which would have defeated his claim for cancellation; and (4) if Hyatt had sued him on his indebtedness prior to January 2, 1963, he could not have pleaded a setoff under California law for the payment of $193,541.48 since it would not have matured at that time. We agree with the principle that mutual debts do not automatically cancel each other. However, it is not applicable here for petitioner and Hyatt expressly

provided for the cancellation. We do disagree, however, with petitioner's statement that the debts were not made in consideration of each other. We think it obvious that Hyatt agreed to the arrangement whereby accounts receivable were set up on the books of Studio Inn and Enterprises for the assets purchased by petitioner in return for requirement that petitioner's indebtedness be offset against Hyatt's payments on the purchase price.

It appears to us that the third and fourth reasons in effect constitute the argument that a breach by petitioner of any of his continuing obligations prior to January 2, 1963, would have entitled Hyatt to immediately sue petitioner on his indebtedness and that under California law he could not have pleaded a setoff with respect to Hyatt's unmatured obligations. See *Estate of Lipman* v. *United States*, 376 F. 2d 455 (C.A. 6, 1967). This argument is necessarily based upon the conclusion that petitioner agreed to the continuing obligations in consideration for Hyatt's agreement to defer payment by petitioner on his indebtedness. We find nothing in the record, however, to support this conclusion. On the contrary, we think the record clearly shows that petitioner's obligations were not made in consideration of Hyatt's agreement to defer the payment of petitioner's indebtedness. We therefore reject this argument as being unsupported by the record.

Secondly, we think it clear that petitioner received the payment of $193,541.48 in 1962 since petitioner and Hyatt accelerated the offset into 1962 by the terms of the letter agreement dated August 29, 1962. In that agreement petitioner and Hyatt stated: "As of this date Hyatt Corporation of America is owed $120,036.11 by you [petitioner]." The schedule attached to the letter reflected as one of the deductions in arriving at the figure of $120,036.11 the payment of $193,541.48 due petitioner on January 2, 1963.

In spite of the letter's clear and concise language, petitioner argues that neither he nor Hyatt had the intention of accelerating the $193,541.48 payment. In support of his argument, petitioner points out that the heading of the schedule used the terms, "Brought Forward To January 2, 1963." He also points to the testimony of Donald Pritzker, who signed the agreement on behalf of Hyatt, to the effect that he did not intend to accelerate the payment.

While Pritzker did say that he did not intend to accelerate the payment of $193,541.48, he also stated several times that as far as he was concerned, on August 29, 1962, Hyatt was owed $120,-036.11 by petitioner. It is inescapable that if petitioner owed Hyatt only that amount on August 29, 1962, Hyatt was not obligated to pay petitioner $193,541.48 on January 2, 1963, because the $193,-

541.48 had already been applied against petitioner's indebtedness to Hyatt to reduce it to $120,036.11 on August 29, 1962.

Accordingly, based upon either of our views as expressed above, we hold that petitioner received the payment of $193,541.48 in the year of sale in addition to the payments of $225,000 and $88,502. Thus, petitioner received total payments in the year of sale amounting to $507,043.48.

Petitioner next contends that even if he received payments in the year of sale for his shares in Studio Inn and Enterprises totaling $507,043.48, he is still entitled to report the gain realized from his Studio Inn stock on the installment method. This contention is necessarily premised on the theory that two separate sales were integrated into one sales contract. For the purpose of entertaining this contention, we will assume, *arguendo*, that petitioner made separate sales of his Studio Inn stock and his Enterprises stock.

In support of his contention, petitioner first maintains that the selling price of his shares in Studio Inn should be $713,574.16 rather than the sales price of $631,605.50 as determined by the audit. It appears that he bases this conclusion upon the interpretation of the following terms of the contract:

(5-b) It is further expressly understood and agreed that in the audit * * * all liabilities of said companies then owing to the selling stockholders and their related companies and all indebtedness of the selling stockholders and their related companies to said companies shall be offset and cancelled to the extent thereof; * * *

In arriving at the figure $713,574.16, petitioner increased the original sales price of petitioner's shares in Studio Inn by $81,968.66, the net liability of Studio Inn to petitioner (and related companies) and correspondingly reduced the selling price of Enterprises by reducing the indebtedness of petitioner (and related companies) to Enterprises by $81,986.66. Petitioner argues that this adjustment is specifically required by the above-quoted terms of the contract, and furthermore that this is necessary to reflect the true value of the assets of Studio Inn. We disagree. To accept petitioner's reasoning, we would have to ignore the fact that petitioner owned only 50 percent of the stock of Studio Inn. Under petitioner's theory the selling price of petitioner's 50-percent interest in Studio Inn would be $713,574.16, while the selling price of the Marstens' 50-percent interest would be $631,605.50. We cannot perceive how this result can in any way reflect the true value of the assets of Studio Inn. Furthermore, the terms of the contract relied upon by petitioner do not provide a basis for this interpretation. As we understand those terms, they require the offset to be made in order to compute the combined sales price of the Studio Inn stock and the Enter-

prises stock, not the separate sales price of such stock. We therefore reject this argument as being a mere attempt on the part of petitioner to juggle figures in a manner which is to his best interest, and as being completely without merit.

Alternatively, petitioner argues that he made sufficient cash repayments of the sales price to reduce the payments he received in 1962 for his shares in Studio Inn below 30 percent of the selling price of such shares. For the purpose of this argument, petitioner agrees that the sales price for petitioner's interest in Studio Inn was $631,605.50 in the year of sale for such interest. He points out that as a result of Hyatt's concern over having paid petitioner too much cash at closing in light of the substantial indebtedness of petitioner to Hyatt, he made cash payments to Hyatt in 1962 totaling $76,763.86. He claims that these payments, of which $42,538.88 is allocable to his shares in Studio Inn, constituted a partial refund of the downpayment he received for his stock and thus reduced the payments he received in the year of sale.

This argument can be readily dismissed as being completely unsupported by the *actual* facts. The $76,763.86 paid by petitioner to Hyatt went to reduce the amount of petitioner's indebtedness to Hyatt and was not a partial refund of the downpayment for the stock. Even if we were to hold that this amounted to a refund of the year of sale payments, we would have to also hold that there was a simultaneous discharge of petitioner's indebtedness to Hyatt in the same amount, which would offset any reduction in the year of sale payments received by petitioner.

### Issue 2. Section 1244 Loss

The second issue before us is whether petitioners are entitled to ordinary-loss treatment under section 1244 on a portion of the loss sustained by petitioners as a result of the liquidation of Rick's Swiss Chalet, Inc. In the notice of deficiency respondent disallowed the loss in toto on the ground that a bona fide liquidation had not occurred. Then, prior to trial, respondent conceded that the liquidation was valid and that petitioner had suffered a loss therefrom. Therefore, in order to place this issue properly before this Court, respondent amended his answer accordingly.

Under Rule 32 of this Court's Rules of Practice, respondent has the burden of proof "in respect of any new matter pleaded in his answer." We think that respondent in his amended answer pleaded new matter within the meaning of Rule 32, and accordingly we find that respondent has the burden of proof in respect to this issue. In reaching this conclusion, we are not unmindful of the well-settled principle that the reasons given in the notice of deficiency do not

constitute the issue and the presumption of correctness which attaches to respondent's determination is not destroyed if the reason is unsoundly or badly expressed. *Estate of Peter Finder*, 37 T.C. 411 (1961). Here, respondent completely abandoned his determination that a loss had not occurred, and in his amended answer made a completely different determination. This, in our mind, amounts to the raising of new matter. However, this does not help petitioner because the record does not support a conclusion that the stock issued to petitioner qualifies as "section 1244 stock" which is a prerequisite to petitioner's claim to the advantages of section 1244.

Petitioners seek ordinary-loss treatment on the portion of the loss attributable to the worthlessness of their stock of Rick's Swiss Chalet. Section 1244 provides an exception to the general rule that losses sustained upon the worthlessness of stock are capital losses by allowing an ordinary-loss deduction when the stock involved is "section 1244 stock."

Section 1244 defines section 1244 stock, in part, as follows:

(c) SECTION 1244 STOCK DEFINED.—
    (1) IN GENERAL.—For purposes of this section, the term "section 1244 stock" means common stock in a domestic corporation if—
        (A) such corporation adopted a plan after June 30, 1958, to offer such stock for a period (ending not later than two years after the date such plan was adopted) specified in the plan,

The regulations, promulgated under the express authority of section 1244(c), provide, in pertinent part, as follows:

Sec. 1.1244(c)–1. Section 1244 stock defined.
    (a) *In general.* In order that stock may qualify as section 1244 stock the requirements described in paragraphs (b) through (h) of this section must be satisfied. * * *

       *        *        *        *        *        *        *

    (c) *Written plan.* (1) The common stock must be issued pursuant to a written plan adopted by the corporation after June 30, 1958, to offer only such stock during a period specified in the plan ending not later than two years after the date the plan is adopted. The two-year requirement referred to in the preceding sentence will be met if the period specified in the plan is based upon the date when, under the rules or regulations of a Government agency relating to the issuance of the stock, the stock may lawfully be sold, and it is clear that such period will end, and in fact it does end, within two years after the plan is adopted. * * *

Respondent contends that neither the corporate minutes, the application for a permit to issue stock, nor the permit to issue stock, either singularly or collectively, constitutes a plan within the meaning of section 1244(c)(1)(A). We agree.

The minutes of the organizational meeting of the board of directors authorized and directed an officer of the corporation to apply for a permit to sell 200 shares of its stock to petitioner for $100

per share, and upon issuance of the permit to sell and issue the 200 shares to petitioner in compliance with all the terms and conditions of the permit and these resolutions. There is no evidence that the corporation even considered adopting a plan to issue "section 1244 stock." We do not believe this meets the requirement of a "plan" within the intendment of section 1244 nor the requirement of the regulation that in order to qualify as section 1244 stock, the stock must be issued pursuant to a written plan adopted by the corporation. *Bernard Spiegel*, 49 T.C. 527. In this connection the Court of Appeals for the Second Circuit made the following remarks in *Godart* v. *Commissioner*, 425 F. 2d 633 (C.A. 2, 1970), affirming 51 T.C. 937, a case involving facts quite similar to the facts in this case in which both this Court and the appellate court held the stock involved failed to qualify as section 1244 stock:

While one could not sustain the position that Congress meant the benefits of § 1244 to be given only to taxpayers who would not have invested without the promise of them, it is hard to see how its purpose would be served by according its benefits in cases where there is no indication that at the time the alleged plan was adopted the corporation had any awareness of the section or any intent to make its extraordinary tax advantages available to investors in the corporation.

      \*      \*      \*      \*      \*      \*      \*

It is true enough that tax consequences generally depend on what people do and not on what they say. But Congress, if it chooses, may condition tax incentives both on doing certain things and on showing in an objective way that they were done with an intention of realizing the benefits Congress had afforded.[5] We do not mean either that ritualistic reference to § 1244 is essential or that such a reference will save a plan that does not meet the statutory tests. We do mean that there must be some substantially contemporary objective evidence that the plan was adopted with § 1244 in view. Such evidence is wholly lacking here. \* \* \* [Fn. omitted.]

Such evidence is also wholly lacking here.

But even if the resolution constituted a plan, the plan failed to specify that the stock had to be offered within 2 years after the adoption of the plan, and, therefore, failed to comply with the specificity requirement of section 1244(c)(1)(A) as to time limitation. *Bernard Spiegel, supra*; *Wesley H. Morgan*, 46 T.C. 878.

Nowhere in the minutes of the organizational meeting was there any intention evidenced that there was a plan to offer stock only within 2 years. Petitioner maintains that this defect is cured by the statement in the permit issued to Rick's Swiss Chalet (formerly The Shack) by the State of California that the permit would terminate on January 30, 1960. Even though petitioner in his original brief argues that he should not be bound by the regulations promulgated under section 1244, since they were adopted subsequent

to the adoption of the plan, he calls our attention to the following language in section 1.1244(c)-1:

(c) *Written plan.* (1) * * * The two-year requirement referred to in the preceding sentence will be met if the period specified in the plan is based upon the date when, under the rules or regulations of a Government agency relating to the issuance of the stock, the stock may lawfully be sold, and it is clear that such period will end, and in fact it does end, within two years after the plan is adopted. * * *

Relying on this language, petitioner argues that the permit is an integral part of the plan adopted by Rick's Swiss Chalet and that the 2-year requirement is thereby satisfied within the meaning of respondent's own regulations.

While it is true that the permit was to terminate on January 30, 1960, it must be pointed out that the permit could be renewed. It is this fact which leads us to the conclusion that even if the resolutions qualify as a plan there was no period specified in the plan for the issuance of the stock which was certain to end within 2 years of the adoption of the plan. The permit could be renewed by making application to the Division of Investments, Department of Corporations of the State of California prior to January 30, 1960, and thus it cannot be said that the requirements of the statute and the regulations promulgated thereunder were complied with in all respects. Petitioner argues that the renewal provision of the permit is of no consequence since if the permit was renewed this act would certainly constitute a new plan. Petitioner also argues that the corporation lacked authority under the resolutions to renew the permit. We cannot agree with petitioner, though, for the resolution of the board of directors directing that the stock be issued in compliance with all the terms and conditions of the permit had the effect of incorporating all of the terms and conditions of the permit into the resolution and making them a part thereof. Thus, if the termination date of the permit can be said to have been incorporated in the resolution or "plan," so was the renewal provision of the permit. Thus, a renewal of the permit would have been within the ambit of the original plan adopted by the board of directors and would not, as petitioner argues, have constituted a new plan to issue stock.

Petitioners also point out, as extrinsic evidence, that the purpose of the formation of the corporation was to acquire a restaurant from the San Francisco Board of Trade and that in the minutes of the organizational meeting the board of directors directed that the negotiations for the purchase of the restaurant be completed after the issuance of the permit to issue shares of stock. They argue that the proceeds to be used for the purchase of the restaurant were to come

from the sale of stock, and that, it necessarily follows, that the sale of stock had to occur as soon as the permit was obtained, so that the restaurant could be purchased.

The only inference, at the most, that can be drawn from these facts is that the corporation contemplated that the stock would be issued prior to the termination date of the permit. This is not sufficient, however, for the statute requires that the 2-year limitation be specified in the plan. *James A. Warner*, 48 T.C. 49 (1967), affd. 401 F. 2d 162 (C.A. 9, 1968).

*Decision will be entered under Rule 50.*