EMORY A. RITTENHOUSE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent THEODORE H. FEINMAN AND JEANNE K. FEINMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rittenhouse v. Commissioner
Docket Nos. 2190-73, 2191-73.
United States Tax Court
T.C. Memo 1975-347; 1975 Tax Ct. Memo LEXIS 26; 34 T.C.M. (CCH) 1507; T.C.M. (RIA) 750347; December 2, 1975, Filed Charles E. McKissock, for the petitioners. David W. Otto, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in the Federal income tax of Emory A. Rittenhouse in the amounts of $22,402.94 and $14,862.18 for the calendar years 1968 and 1969, respectively. Respondent determined deficiencies in the Federal income tax of Theodore H. and Jeanne K. Feinman in the amounts of $24,006.27 and $15,604.83 for the calendar years 1968 and 1969, respectively. Some of the issues raised by the pleadings have been disposed of by agreement of the parties leaving for decision the following: (1) What was the basis of each petitioner in the stock of a corporation, Little Miss Canning, Inc., when that stock became *31 worthless in 1968 and whether that stock was "section 1244" stock so as to entitle each petitioner to treat his loss from the worthlessness of that stock as a loss from the sale of a noncapital rather than a capital asset to the extent permitted by section 1244, I.R.C. 1954. [1]
(2) What amounts did each petitioner advance to the corporation, Little Miss Canning Inc., and whether those advances when they became worthless in 1968 constituted business bad debts or nonbusiness bad debts. (3) Whether each petitioner is entitled to deduct in 1968 or 1969 either under sections 162, 165, or 166 the value or basis of his assets which, after his filing a voluntary petition in bankruptcy, were turned over to the trustee in bankruptcy and later sold by or under the direction of the trustee. (4) Whether petitioners are required to recapture in 1968 investment tax credit passed through to them while the corporation in which they were shareholders held a valid election to be taxed under the provisions of Subchapter S, but which election was terminated prior to 1968, *32 the year in which the property ceased to be section 38 property. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Emory A. Rittenhouse, who resided at McKeesport, Pennsylvania when his petition in this case was filed, and his wife, Ellen C. Rittenhouse, [2] filed joint Federal income tax returns for the calendar years 1968 and 1969 with the District Director of Internal Revenue at Pittsburgh, Pennsylvania. The records of Emory A. and Ellen C. Rittenhouse were kept and their income reported for the years 1968 and 1969 on the cash basis of accounting. Theodore H. Feinman and Jeanne K. Feinman, who resided at McKeesport, Pennsylvania at the time of filing their petition in this case, filed joint Federal income tax returns for the calendar years 1968 and 1969 with the District Director of Internal Revenue at Pittsburgh, Pennsylvania. The records of Theodore H. and Jeanne K. Feinman were kept and their income reported for the years 1968 and 1969 on the cash basis of accounting. Theodore *33 Feinman (Dr. Feinman) is a licensed optometrist and businessman. Dr. Feinman completed his studies in 1942. After four years service with the United States Navy he began to practice his profession and has since been continuously engaged in the practice of optometry on a full-time basis. From the time Dr. Feinman began the practice of optometry it has been his major source of income. Beginning about 1950 Dr. Feinman has participated in various business and investment activities. During the period from 1950 to 1968, he considered a number of potential business ventures but participated in only the following: (1) In 1950 Dr. Feinman purchased a 7/144 interest in the Baum Building located in Pittsburgh, Pennsylvania. He made the purchase with the intent to resell at a profit, but he held the property for eighteen years. The Baum Building was a five-floor commercial building from which Dr. Feinman received a portion of the rental income produced during the time he owned his 7/144 interest. (2) In 1955 Dr. Feinman and another individual, Mr. Orlando, executed a lease on 2.81 acres of land in Monroeville, Pennsylvania and began the operation of a nursery. Shortly thereafter they purchased *34 the land with money borrowed from Western Pennsylvania National Bank (WPNB) and built a produce building on the land. Dr. Feinman and Mr. Orlando caused a furniture store and a restaurant to be constructed on part of the property and later a movie theatre and a drugstore were built on the property. The property became known as the Country Gardens Shopping Center. The buildings constructed on the property were financed through a line of credit with WPNB which had the personal guarantees of Dr. Feinman and Mr. Orlando and their wives. Dr. Feinman and Mr. Orlando received rental income through the lease of some of the property to commercial tenants. Dr. Feinman and Mr. Orlando established a fish and poultry store in a warehouse in the shopping center. Although this store was a successful operation, Dr. Feinman and Mr. Orlando concluded that it would be more advantageous to rent the space so the store was closed and the space was leased to a drugstore. At a later date, a further portion of the land was paved and then leased to Zayre Co. Dr. Feinman held his interest in Country Gardens Shopping Center until December 1968. (3) Dr. Feinman, along with four or five other individuals, purchased *35 a farm in West Virginia located adjacent to Little Miss Canning Co., Inc. About one year after the purchase, Dr. Feinman and Mr. Orlando purchased the interest of the other owners and transferred the property to Little Miss Canning Company. The purchase of this land was financed through WPNB. Union Real Estate, which was the only broker ever used by Dr. Feinman, managed all of his properties for him. Dr. Feinman did not receive any fees or commissions during the course of his activities. Dr. Feinman would spend the time he considered necessary with his various business activities or prospective activities. Jeanne K. Feinman owned a 1/6 interest in a commercial building known as the Kalchstein Building located in McKeesport, Pennsylvania and received rental income from this interest. She held this interest until 1968. Emory A. Rittenhouse (Dr. Rittenhouse) is a licensed physician specializing in eye, ear, nose and throat treatment. He has been engaged in the private practice of medicine on a full-time basis since he graduated from the University of Pittsburgh in 1936, except for a five-year tour of duty in the United States Army, and during this entire time the practice of medicine *36 has been his primary source of income. However, Dr. Rittenhouse has also engaged in business and investment activities outside of his practice of medicine. He began these activities in 1947 when he became interested in the drilling of oil wells. Dr. Rittenhouse has considered a number of transactions, but he entered into only the following: (1) He invested in three ventures for the drilling of oil wells over a seven-year period from 1947-1954. Two of these ventures proved successful and returned a profit to him with one continuing to produce through 1959. (2) In 1957, Dr. Rittenhouse, along with two other individuals, purchased an automobile agency located in McKeesport, Pennsylvania and sold it a year later so as to minimize his losses. (3) In 1961, Dr. Rittenhouse acquired a professional building in Madeira Beach, Florida, which he sold in 1968 at a small loss because of problems connected with absentee ownership. (4) In 1962, Dr. Rittenhouse acquired an option to purchase land in Florida that he felt would be suitable for development, but when he could not interest other individuals in investing in this land, allowed the option to lapse. (5) In 1962, Dr. Rittenhouse and *37 another individual purchased an island in Florida which they hoped to resell at a profit to another group constructing condominiums in that area. The island was sold at a profit in 1968. (6) In 1962, Dr. Rittenhouse acquired a franchise for timber-wall homes. He sold one home, but for personal reasons did not continue with the arrangement. (7) In 1963, Dr. Rittenhouse and other individuals advanced funds for the purpose of developing a resort area in Ohio. However, this project did not materialize and he was returned the amount of his advance. (8) In 1971, Dr. Rittenhouse acquired an option to purchase some land that fronts on the Gulf of Mexico, but when he could not interest other individuals in investing in the land, did not exercise the option. Dr. Rittenhouse would spend the time he considered necessary with his business activities. At times he would spend approximately an hour a day at his office using the telephone contacting persons he considered he might interest in joining him in some proposed activity. Dr. Feinman and Dr. Rittenhouse both became shareholders in Little Miss Canning Co., Inc., a corporation located in Berkeley Springs, West Virginia. Little Miss *38 Canning Co., Inc. (Little Miss) is a West Virginia corporation, originally incorporated April 11, 1952, as Little Miss Tomatoes, Inc. Throughout its existence Little Miss was engaged in and its sole income has been derived from the production, processing, and sale of canned fruits and vegetables. The original capital structure of the corporation included 21 shares of stock with a par value of $1,000 per share. The original three incorporators and owners of Little Miss were Alex Canafara, 7 shares; Stephen Orlando, 7 shares; and Charles E. Miller, 7 shares. Little Miss used a fiscal year ending June 30 and reported its income and expenses on an accrual basis of accounting. Prior to 1965 Mr. Orlando and Dr. Feinman became the only two shareholders of Little Miss, each owning 10.5 shares of the outstanding common stock. On approximately November 26, 1965, Mr. Orlando and Dr. Feinman brought new stockholders into the company by selling to the new participants a portion of the stock held by them. One of the new shareholders was Dr. Rittenhouse, who acquired 3.15 shares of the total outstanding stock of 21 shares. Two other individuals, Dr. Keller and Mr. Sable, also acquired 3.15 shares *39 each. Dr. Feinman sought these new investors in Little Miss to obtain help and business acumen and not for additional capital or financial assistance. At the end of 1965 the common stock of Little Miss was held as follows: Orlando
- 5.775 shares at
$1,000 par value
$ 5,775
Feinman
- 5.775 shares at
$1,000 par value
5,775
Rittenhouse
- 3.150 shares at
$1,000 par value
3,150
Keller
- 3.150 shares at
$1,000 par value
3,150
Sable
- 3.150 shares at
$1,000 par value
3,150
21 authorized shares of
common stock
$21,000
During the taxable years ended June 30, 1965 and 1966, Little Miss was an electing small business corporation pursuant to section 1372 of Subchapter S. The Subchapter S election for Little Miss was not made for the fiscal year beginning July 1, 1966. On July 1, 1966, the common stock held by Dr. Rittenhouse in Little Miss had an adjusted basis of $11,385.18. Dr. Feinman's adjusted basis in the stock he held in Little Miss as of July 1, 1966, was $0. Both Dr. Feinman and Dr. Rittenhouse were active in the affairs of Little Miss. During the years 1962-1965, when Dr. Feinman and Mr. Orlando were the owners of the outstanding *40 common stock, the plant capacity was expanded. The expansion included the addition of a new peeling table, a new warehouse, a new boiler, and a new peach line. The owners felt that the location of the physical facilities of Little Miss was excellent because of the proximity to transportation, labor, and growing areas. After Dr. Rittenhouse became a stockholder in 1965, the company continued to expand. Both Dr. Feinman and Dr. Rittenhouse spent time at the cannery helping supervise the placing of equipment, interviewing prospects for a full-time plant manager, making contractual arrangements for the purchase and sale of the cannery products, and handling the everyday problems of the business as they arose. During some periods of time both Dr. Feinman and Dr. Rittenhouse would spend as much as 20 hours per week at the cannery attempting to develop a smooth functioning business. Subsequent to July 1, 1966, both Dr. Feinman and Dr. Rittenhouse advanced monies to Little Miss or incurred obligations on behalf of the corporation. Dr. Feinman spent the following amounts on the dates and for the purposes indicated: Date
Payee
Reason
Amount
8/68
S.B.A.
Portion of amount owed
by Little Miss
$15,000.00
12/67
Nate Apter
Employee of Little Miss
4,500.00
3/67
Tom Mayfield
Escrow account required
by bank for Little
Miss
5,000.00
12/67
John Spicer
Appraisal for Little
Miss
750.00
11/67
John Spicer
Appraisal for Little
Miss
750.00
11/67
Bill Denofrio
Advances to agent of
Little Miss
200.00
1/67
Little Miss
Loan to Little Miss
2,000.00
12/67
Little Miss
Purchase of equipment for
Little Miss
75.58
12/67
Little Miss
Purchase of small equip-
ment for Little Miss
312.50
1/68
Little Miss
(No reason given)
300.00
7/68
Little Miss
Bank advanced money to
payroll account
3,000.00
Total
$31,888.08
*41 Dr. Feinman, in addition, paid the following amounts on behalf of Little Miss for the purposes indicated: Payee
Reason
Amount
Gulf Oil Corp.
Oil for boilers of
Little Miss
$ 2,701.62
Mobil Oil Co.
Oil for boilers of
Little Miss
1,815.62
Texaco Oil Co.
Oil for boilers of
Little Miss
245.79
Humble Oil Co.
Oil for boilers of
Little Miss
172.98
Little Miss
Equipment purchased
for Little Miss
5,058.84
Little Miss
Equipment for Little
Miss
3,155.62
Pennzoil Co.
Crude Oil for Little
Miss
1,663.23
Little Miss
Hotel expense incurred
on behalf of Little
Miss
327.66
Dr. Rittenhouse
Repayment of proportion-
ate share of advances
to Little Miss by Dr.
Rittenhouse
5,290.50
Miscellaneous
25.63
Little Miss
Airline fares on be-
half of Little Miss
290.81
Total
$20,748.30 The amount advanced by Dr. Feinman to Little Miss and the amounts paid by him on behalf of Little Miss were loans by Dr. Feinman to the corporation. Between the dates of July 1, 1966 and September 1, 1968, Dr. Rittenhouse advanced $96,200 directly to Little Miss. These advances were made to supply Little Miss with the money to buy *42 raw products, to install equipment, to pay wages and salaries, and to pay for various improvements. Dr. Rittenhouse also incurred other obligations and made payments on behalf of Little Miss. The expenditures, which included payments to various banks, were as follows: Date
Payee
Reason
Amount
12/66
Peoples Union Bank
Loan by Dr. Ritten-
12/66
McKeesport National
house with proceeds
Bank
to Little Miss
$35,000
12/67
Western Pennsylvania
Interest payment on
National Bank
loan to Little Miss
500
8/68
Hancock Maryland
Loan to Little Miss
Bank
to buy produce
5,200
3/67
Western Pennsylvania
Principal payment for
National Bank
Little Miss
5,000
Total
$45,700 In 1968 he paid interest of $200 to Peoples Union Bank on a personal loan and from October 1967 to October 1968 paid interest of $2,321.09 to McKeesport National Bank on a personal loan. On his 1968 return he deducted $1,211.78 as interest paid to McKeesport National Bank but deducted no amount as interest paid to Peoples Union Bank. On February 10, 1966, the five shareholders of Little Miss and their respective wives executed a guaranty agreement with WPNB in which *43 they agreed to jointly and severally guarantee to WPNB the payment of loans made to Little Miss under an unlimited line of credit. As part of the agreement the parties agreed to a provision to allow WPNB to confess judgment against them in the event the loan was in default and further agreed that WPNB could proceed against them without first pursuing its remedies against Little Miss. By November of 1966 Little Miss had received a sum of $1,400,000 from WPNB under the agreement. On November 2, 1966, a deed of trust was executed by Little Miss in favor of C. Samuel Trump, Trustee, to secure a deed of trust note of the same date. This deed of trust declared the conveyance was to secure the $1,400,000 loan advanced to Little Miss by WPNB and provided for annual installments beginning in March of 1968. This instrument covered specified real estate, buildings and equipment of Little Miss. On October 4, 1967, pursuant to the confession of judgment clause included in the guaranty agreement, WPNB filed suit in the Court of Common Pleas of Allegheny County, Pennsylvania against the 10 guarantor-stockholders of the debt of Little Miss. Confession of judgment was entered against the parties *44 on that date in the amount of $1,610,000 to cover the $1,400,000 advanced under the line of credit plus a 15 percent attorney's fee provided for in the guaranty agreement. [3] No attempt was made by WPNB to execute on the judgment. Because of the continued need of Little Miss for operating funds, in November 1967 the stockholders of Little Miss decided that if additional shares of common stock were to be authorized for Little Miss they might be able to interest others to become investors in Little Miss's stock. A meeting of the stockholders of Little Miss was held in November 1967 in the office of the attorney for the corporation in McKeesport. Dr. Rittenhouse, Dr. Feinman, Mr. Orlando, and Mr. Sable were present at that meeting. It was decided at that meeting that Little Miss would seek the permission of the State of West Virginia, which was given, to increase its capital structure from 21 shares of common stock with a par value of $1,000 per share to 1,000 shares of common stock *45 with a par value of $1,000 per share, or a total par value of $1,000,000. It was further agreed at that meeting that the existing shareholders would have the right to each purchase 50 shares of the increase in common stock for $50,000 and that the offer was to be accepted or rejected immediately. Dr. Rittenhouse accepted the offer and purchased an additional 50 shares of common stock by paying $15,000 cash and canceling $35,000 of the amount owed to him by Little Miss from previous advances. Dr. Feinman also accepted the offer to purchase 50 additional shares under the same arrangements. It was the intent of the shareholders that the additional shares purchased would qualify for the benefits provided under section 1244 and there was some discussion of this intent. Minutes of the meeting were placed in the corporate offices of Little Miss. [4] On December 30, 1967, the stock was issued to the individual shareholders, including Dr. Feinman and Dr. Rittenhouse, who placed their certificates in the office of Little Miss for safekeeping. *46 On December 31, 1967, besides the stock issued to the shareholders on December 30 there existed certain contingent subscriptions to the common stock of Little Miss, should a loan from the Economic Development Administration be approved. This loan was never approved. In 1968, in a further attempt to raise funds for Little Miss, the corporation sought and received a loan of $390,000 from the Small Business Administration through WPNB. In late 1968 the operations of Little Miss ceased because WPNB called their main loan and, under the deed of trust executed pursuant to the line of credit extended to Little Miss, the trustee took over the assets of Little Miss on December 21, 1968. The shareholders were thereafter denied access to the padlocked premises. On December 11, 1968, both Dr. Feinman and his wife Jeanne and Dr. Rittenhouse filed a voluntary petition in bankruptcy. Thereafter their properties, except those exempt by the bankruptcy laws, were taken by the trustee in bankruptcy and sold in 1969 under his direction. In the bankruptcy petition filed by each Dr. Feinman and Dr. Rittenhouse the statement was made that the petitioner was engaged in no business but was engaged *47 only in the practice of his medical profession. On their respective joint Federal income tax returns for 1965 and 1966, petitioners claimed investment tax credit on machinery and equipment placed in service by Little Miss during 1965 and 1966 and passed through to petitioners by virtue of section 1372 as follows: Feinman
Rittenhouse
1965
$3,009.29
$ 0
1966
7,397.78
4,035.15 In 1965 there was recaptured from Dr. Feinman $1,354.18 of the investment tax credit claimed in 1965. All remaining section 38 property of Little Miss on which the investment tax credit was claimed in 1965 and 1966 ceased to be section 38 property with respect to Little Miss during November 1968. On November 30, 1968, all assets acquired during 1965 and 1966 had been in service for a period of less than four years. On his Federal income tax return filed for 1968 Dr. Rittenhouse took a deduction from ordinary income in the amount of $260,434.45, giving the following explanation: Investment in Little Miss Canning Co., Inc. section 1244 stock. Company adjudicated bankrupt in Federal Bankruptcy Court in 1968. [5] Emory A. and Ellen A. [sic] Rittenhouse: Investment in company - total *48 ordinary loss -. Dr. Rittenhouse then filed a claim to carry back the unused loss to the taxable years ending December 31, 1965, 1966, and 1967, which left an amount to be carried over to 1969 that Dr. Rittenhouse claimed on his 1969 return. Dr. Rittenhouse determined the amount of the claimed loss of $260,434.45 as being composed of the following: Loss
Residual value of Subchapter S basis
of Little Miss on July 1, 1966
$ 8,919.78 *
Payment of interest, loans, meetings,
insurance and all other types of pay-
ments made for Little Miss
154,914.67
Loss on stocks sold by McKeesport
National Bank due to money borrowed by
petitioner and used on behalf of Little
Miss
31,600.00
Loss of home and adjoining extra lot
due to business activities of Little
Miss
65,000.00
$260,434.45
In his statutory notice of deficiency respondent disallowed the loss because it is determined that the loss of $260,434.45 from Little Miss Canning Co., *49 Inc. claimed in the return was not substantiated pursuant to the provisions of Section 1244 and therefore, the loss does not qualify as a Section 1244 loss and is not deductible. Furthermore, the amount is not deductible as a business bad debt pursuant to the provisions of Section 166. Respondent also denied the claimed loss carryover to 1969, which resulted in the determination of the deficiency for 1969. At the trial and on brief Dr. Rittenhouse contends only that his stock investment to the extent of $50,000 is deductible as a section 1244 loss and contends that the balance of the loss is deductible as an ordinary loss pursuant to section 166(a) because he was in the trade or business of promoting corporations. Respondent takes the position that petitioner's loans to the corporation which became worthless in 1968 are nonbusiness bad debts limited by section 166(d) to deduction as a short-term capital loss. Respondent in his notice of deficiency to Dr. Rittenhouse also determined a recapture of investment credit in 1968 in the amount of $9,052.89. On their 1968 joint Federal income tax return Dr. and Mrs. Feinman claimed an ordinary loss in the amount of $305,731.09 with the *50 following explanation: Investment in Little Miss Canning Co., Inc. section 1244 stock. Company adjudicated bankrupt in Federal Bankruptcy Court in 1968. Theodore H. and Jeanne K. Feinman's investment in company - total ordinary loss -. Dr. Feinman filed a claim to carry back the unused loss to the taxable years ending December 31, 1965, 1966, and 1967 and on his 1969 return claimed the balance of the loss remaining as a carryover. Dr. Feinman determined the amount of the claimed loss in the following manner: Loss
Payments made to Little Miss and to
others for promotion of the business
of Little Miss
$ 73,303.43
Loss on stocks sold due to money
borrowed and used to promote the busi-
ness of Little Miss
32,529.60
Loss of properties due to promotion of
the business of Little Miss
203,600.00
Subtotal
$309,433.03
Less - Basis of Subchapter S
stock used in excess of cost
(3,701.94) *
Total
$305,731.09
Respondent in his notice of deficiency to Dr. and Mrs. Feinman disallowed *51 the loss because it is determined that the loss of $305,731.09 from Little Miss Canning Co., Inc. claimed in the return was not substantiated pursuant to the provisions of Section 1244 and therefore the loss does not qualify as a Section 1244 loss and is not deductible. Furthermore, the amount is not allowable as a business bad debt pursuant to the provisions of Section 166. Dr. Feinman has taken the same position at trial as Dr. Rittenhouse. He no longer contends that the loss is deductible in full as a section 1244 ordinary loss but that part of the loss is deductible pursuant to section 1244 and that the remainder of the loss claimed is deductible under section 166(a) as a business bad debt because he was in the trade or business of being a promoter. Respondent takes the position that such advances by Dr. Feinman to Little Miss are nonbusiness loans which became worthless in 1968 which are deductible under section 166(d) as a short-term capital loss. In his notice of deficiency to Dr. Feinman respondent determined a recapture of investment credit of $4,035.15 for the year 1968 and for the year 1969 disallowed the claimed net operating loss carryover based on the 1968 claimed *52 loss in connection with the investment in and advances to Little Miss. OPINION On their 1968 Federal income tax return Dr. Rittenhouse and Dr. Feinman each deducted the entire loss that he determined had been suffered through the ownership of stock in Little Miss as a loss falling within the provisions of section 1244. However, it is clear, and the petitioners no longer contend otherwise, that the only portion of the claimed loss that could possibly satisfy the requirements of section 1244 was the stock of Little Miss issued to the petitioners in December 1967 pursuant to a shareholders meeting held in November 1967. At that shareholders meeting, Dr. Rittenhouse and Dr. Feinman, along with at least two other shareholders, were given the option to purchase 50 additional shares of stock in Little Miss for $50,000 with each to put up $15,000 cash and the remainder to be paid for by the cancellation of indebtedness owed to them by Little Miss by virtue of amounts advanced by them to the corporation prior to that date. Although the facts and documentary evidence are not clear, and are in some areas contradictory we have found that such stock was actually purchased in such manner. *53 This leaves for decision whether the stock issued to petitioners met the requirements of section 1244. Section 1244[6] provides in general that a shareholder who incurs loss in connection with "section 1244 stock" may treat such loss as an ordinary loss rather than a loss from the sale or exchange of a capital asset to the extent specified in subsection (b). *54 It is the contention of petitioners that the issuance of stock of Little Miss in December 1967 was pursuant to a plan that meets the requirements of section 1244. Respondent maintains that the requirements were not met. Section 1244(c) defines section 1244 stock as common stock of a domestic corporation which meets certain requirements.[7] One of the requirements of section 1244(c)(1)(A) is that the stock is issued pursuant to a plan adopted after June 30, 1958. Section 1.1244(c)-1(c)(1), Income Tax Regs., requires that a plan set out in section 1244(c)(1)(A) must be a written plan. We have previously held that this regulation requiring a written plan to be adopted by the corporation is a valid and reasonable exercise of the broad authority granted to the Commissioner by section 1244(e). Bernard Spiegel,49 T.C. 527, 531 (1968); Wesley H. Morgan,46 T.C. 878, 889-890 (1966). *55 No written plan adopted by the corporation has been placed in the record in this case. If from this we conclude that the stock has not been shown to be issued pursuant to a written plan, then the issuance of the stock fails to comply with the requirements of section 1244. It is the position of the petitioners that a written plan was adopted by the corporation, but that due to circumstances beyond their control the records of Little Miss including this written plan could not be obtained. When WPNB took control of Little Miss pursuant to the execution of judgment on the deed of trust, the premises of the cannery were padlocked and the individual shareholders, officers, and employees were subsequently denied entrance to the corporate offices containing the records. Petitioners maintain that these facts justify the proof of a written plan by secondary evidence. However, it is our determination that petitioners have not adequately demonstrated that the failure to produce the corporate records showing the existence of a written plan was beyond their control. Petitioners have failed to show that an adequate search was made for the records that would show the existence of such a plan. Petitioners *56 did nothing more than subpoena, during the conduct of the trial, a bank official from the home office of WPNB who testified that he had no knowledge of any records of Little Miss, but also that he had not had time for an adequate search. The burden of proving that a written plan existed is on petitioners. In our view, to discharge this burden petitioners must exercise reasonable diligence to obtain the documents necessary to establish the existence of a written plan. [8] This was not done. Therefore, the loss on the worthlessness of stock in 1968 is to be governed by section 165(g) and the limitations imposed by sections 1211 and 1212. *57 Even assuming, arguendo, that the inconclusive testimony of petitioners was acceptable to establish the existence of a written plan seeking the benefits of section 1244, petitioners have failed to show that the other requirements of section 1244(c) have been met. We have held that all the requirements of section 1244(c), not merely the requirement of a written plan, must be strictly complied with in order for a stockholder to be entitled to the benefits allowed under section 1244(a) and (b). Wesley H. Morgan,supra, at 889 (1966). The components of the plan alluded to by petitioners in their testimony are not sufficient to comply with section 1244(c)(1). Within that section are five requirements that must be met and petitioners have failed to show compliance with several requirements. Failure to comply with any one of these five requirements deprives a stockholder of the benefits of section 1244(a) and (b). Under section 1244(c)(2), two requirements must be met for Little Miss to *58 be a small business corporation. One of these requirements is that the aggregate amount that may be offered under the plan plus capital contributions and paid-in surplus of the corporation received after June 30, 1958, does not exceed $500,000. There is nothing in the record to show that any plan adopted by Little Miss met this limitation. The Secretary of State for the State of West Virginia allowed an increase in the capital structure of Little Miss from $21,000 to $1,000,000 subsequent to the November 1967 meeting when petitioners testified that the section 1244 plan was adopted. The parties had the idea of selling the additional stock authorized under Little Miss's charter to raise outside capital for the company and there is no evidence to show what the price of the additional shares might have been if sold, or how many of the additional shares might be sold. There is nothing in this record from which we can conclude that the only additional shares to be offered for sale through the plan were the 50 shares offered to each shareholder. By selling at par value approximately one-half of the additional authorized shares, the dollar limitation requirement imposed by section 1244(c)(2)(A) *59 would have been exceeded. In Pierre Godart,51 T.C. 937 (1969), affd. 425 F. 2d 633 (2d Cir. 1970), we held that the failure of a plan to specifically state in terms of dollars the maximum amount to be received in consideration for the stock to be issued pursuant to a plan under section 1244 was sufficient to disqualify such a plan from the benefits granted by section 1244. Also see William Siebert, Sr.,53 T.C. 1 (1969). The record also lacks any indication as to the length of time of any offering of the stock available for issuance subsequent to the increase in capital structure of Little Miss in November 1967. Section 1244(c)(1)(A) allows a period of two years after the plan is adopted as the maximum time during which the stock may be offered. A statement limiting the time of the offer of the stock to two years is required within the plan in order for the plan to meet the requirements of section 1244. In Spillers v. Commissioner,407 F. 2d 530 (5th Cir. 1969), affirming a Memorandum Opinion of this Court, the court stated *60 that the definitional requirements must be met at the time of the adoption of the plan and the failure to state the period during which the stock could be offered along with the maximum dollar limitation contained in section 1244(c)(2) made the plan fatally defective. Also see Warner v. Commissioner,401 F. 2d 162 (9th Cir. 1968), affg. 48 T.C. 49 (1967), where the failure to specifically provide for a maximum of a two-year period for offering the stock was held to be a fatal defect in a purported plan. Petitioners failed to include information as to the records of Little Miss dealing with the claimed plan under section 1244 and how the stock was issued pursuant thereto with their Federal income tax return for the year the loss was sustained as contemplated by section 1.1244(e)-1(a) and (b), Income Tax Regs. We need not decide whether the requirements of these regulations must be substantially met in order to fulfill the requirements of section 1244. However, in our view the failure to comply with these regulations by the petitioners in this case indicates that when the meeting was held in November 1967 in which the asserted section 1244 election was *61 made, petitioners were not acting with full knowledge of the specific requirements of section 1244 needed to adopt a valid plan. [9] See Godart v. Commissioner,425 F. 2d 633, 637, 638 (2nd Cir. 1970), affg. 51 T.C. 937 (1969). We therefore conclude that petitioners are entitled to long-term capital losses on the worthlessness of their stock of Little Miss in 1968 in the following amounts: Dr. Feinman
Residual Value of Subchapter S
Stock of Little Miss $0
Purchase of Stock of Little Miss,
December 1967
50,000.00
Total
$50,000.00
Dr. Rittenhouse
Stipulated Residual Value of Sub-
chapter S Stock of Little Miss
$11,385.18
Purchase of Stock of Little Miss,
December 1967
50,000.00
Total
$61,385.18
The parties *62 have stipulated that advances made by petitioners to or on behalf of Little Miss constitute loans rather than contributions to capital and agree that these debts became worthless in 1968. This leaves in issue the amount of such loans and whether either Dr. Feinman or Dr. Rittenhouse is entitled to a business bad debt deduction when such loans became worthless in 1968. At the outset we note that the corporate balance sheets of Little Miss are of no aid in determining the amounts advanced to Little Miss by petitioners, as the amounts shown as "notes payable to shareholders" did not always reflect advances made by individual shareholders and purported to be a combined total figure for all shareholders. Also, neither petitioner ever took back notes from the corporation for advances made, but respondent conceded on brief that whatever amounts of advances were made by petitioners should properly be treated as loans. Respondent, on brief, has conceded that some of the amounts claimed as a loss by Dr. Feinman were in fact advanced and should properly be characterized as loans made to Little Miss. However, respondent contends that the following claimed expenditures by Dr. Feinman were not *63 adequately substantiated or were not shown to have been incurred on behalf of Little Miss: Payee
Reason
Amount
Peoples Union Bank
Repayment of Loan
$19,824.83
Little Miss
Automobile Expenses
860.93
American Express
Expense of Little
Miss
614.20
Little Miss
Miscellaneous
655.00 *
Little Miss
Airline Fares
290.81
Little Miss
Entertainment
300.00
Feinman & Orlando
Monroeville Shop-
ping Center
1,000.00
$23,545.77
We have effectively disposed of this factual issue in our findings. The payment of the money to Peoples Union Bank was to repay a loan made to Dr. Feinman personally, even though the proceeds of the loan had been lent by Dr. Feinman to Little Miss. The amounts so advanced by Dr. Feinman to Little Miss have been included separately in computing his loans to Little Miss. The repayment to Peoples Union Bank through the sale of securities is merely the extinguishment of a personal debt of Dr. Feinman. On Schedule D of Dr. Feinman's 1968 Federal income *64 tax return he properly reported the net long-term capital gain on the sale of the securities. The amount received in excess of the outstanding amount of the loan was transferred to a payroll account of Little Miss. Dr. Feinman suffered no additional loss on the repayment of the loan. Two of the other amounts in question are not properly included in the total amount of money advanced to Little Miss. The item of $1,000 paid by Dr. Feinman and Mr. Orlando and an item in the amount of $250 included in the miscellaneous total were for amounts advanced not to Little Miss but to the Monroeville Shopping Center in which Dr. Feinman held a partial interest. Therefore, these two amounts are properly removed from the total amount claimed by Dr. Feinman to have been advanced to Little Miss. Another item not properly included in the total advance is the claimed automobile expense. The parties reached a stipulation at trial as to the automobile expense incurred by Dr. Feinman in connection with his medical practice which was properly deductible under section 162. This agreement did not encompass the claimed automobile expense incurred in connection with activities involving Little Miss. No evidence *65 has been presented in connection with the automobile expense incurred by Dr. Feinman on behalf of Little Miss which might properly be considered as showing that the amount was an obligation of Little Miss paid by Dr. Feinman. In fact, Dr. Feinman could not remember how the amount of automobile expense he claims to have been paid for Little Miss was determined. Therefore, this amount is not properly includable in advances to Little Miss by Dr. Feinman for failure of substantiation. Another item not properly includable is the amount of $300 for entertainment expenses claimed to have been incurred in behalf of Little Miss. Dr. Feinman had no recollection of any specifics of how the entertainment expenses were incurred. The amount claimed by Dr. Feinman as advanced to Little Miss in payments to American Express for an unidentified expense and the deduction for "miscellaneous" except to the extent conceded by respondent must also be denied for lack of substantiation on the part of petitioners. In addition, in determining the amount of money advanced to Little Miss by Dr. Feinman as loans which became worthless debts in December 1968, the total amount must be reduced by $35,000 which was *66 the amount of indebtedness of Little Miss to Dr. Feinman forgiven in return for the issuance of additional shares of stock of Little Miss in December 1967. This $35,000 has not been otherwise accounted for in the record. Therefore, we conclude that the total advanced to Little Miss by Dr. Feinman which is properly characterized as loans is as follows: Total claimed
$75,891.34
Amount disallowed
23,254.96
Total
$52,636.38
Less: Forgiveness of
indebtedness
35,000.00
Total
$17,636.38
The parties have stipulated that Dr. Rittenhouse advanced $96,200 directly to Little Miss between the dates of July 1, 1966 and September 1, 1968. Respondent, on brief, further concedes that $35,000 was obtained by Dr. Rittenhouse as the proceeds of a personal loan and that the proceeds were in turn advanced to Little Miss as a loan by Dr. Rittenhouse. Respondent further concedes that Dr. Rittenhouse made payments of $5,000 and $500 to WPNB on behalf of Little Miss and also paid $5,200 to Hancock Maryland Bank for the benefit of Little Miss. Only the following items remain in issue with respect to amounts of Dr. Rittenhouse's loans to Little Miss: McKeesport National Bank
$2,321.09
Peoples Union Bank
200.00
Ben Gross
49.00
Dominion Life Insurance
of Canada
434.84
Total
$3,004.93
*67 The parties have stipulated that Dr. Rittenhouse made these payments to these banks, but did not stipulate as to the purpose of the payments. We conclude that these payments were interest payments on loans held by Dr. Rittenhouse personally. Although bank liabilities were itemized on the balance sheet of Little Miss, the above two accounts did not appear. However, we conclude that the payment to Peoples Union Bank of $200 is properly deductible under section 163 as an interest deduction of Dr. Rittenhouse in 1968 rather than includable as an advance to Little Miss. The record shows that the interest payment to McKeesport National Bank was made between October 1967 and October 1968 and that Dr. Rittenhouse deducted an interest payment to this bank in 1968 of $1,211.78. Therefore, we have no basis for concluding that any portion of this payment that might not already have been deducted is deductible as an interest payment by Dr. Rittenhouse in 1968. There is nothing in this record to show that the $49 payment to Ben Gross alleged to be for a business meal was a payment on behalf of Little Miss. Because of this lack of substantiation, we conclude that this amount was not an advance *68 by Dr. Rittenhouse to Little Miss and for the same reason conclude that the payment to Dominion Life Insurance of Canada has not been shown to be a loan to Little Miss. This payment was of a premium on a life insurance policy apparently on the life of Dr. Rittenhouse and possibly some other officers of the corporation. There has been no showing of what amount, if not all, of this payment was applicable to insurance on Dr. Rittenhouse's life, who owned the policy or who authorized the purchase. Therefore, no showing that the amount of this payment was a loan to Little Miss is made in this record. Therefore, we hold that Dr. Rittenhouse made the following advances to Little Miss: Direct advances to Little Miss
$ 96,200.00
Proceeds of loan advanced to Little Miss
35,000.00
Payments on behalf of Little Miss
10,700.00
Total
$141,900.00
Less: Dr. Feinman's reimbursement to
Dr. Rittenhouse on money ad-
vanced to Little Miss
(5,290.50)
Cancellation of indebtedness on
issuance of stock December 1967
(35,000.00)
Total
$101,609.50 The parties agree that these advances by Dr. Rittenhouse to Little Miss were loans and that these debts became worthless in 1968. *69 The next issue is whether the loans made by Dr. Feinman and Dr. Rittenhouse to Little Miss, which became worthless in 1968, are deductible as business or nonbusiness bad debts. On his Federal income tax return filed for 1968 Dr. Feinman deducted the entire amount of his claimed advances to Little Miss as an ordinary loss allowed by section 1244. At the trial he no longer contended that he was entitled to the deduction as claimed but did contend that the amounts determined to be loans were deductible as business bad debts under section 166(a). The basis of his contention is that he was in the trade or business of being a promoter. Respondent takes the position that the characterization of Dr. Feinman's activities outside the practice of medicine as constituting a trade or business is improper and argues that the bad debts are nonbusiness bad debts within the provisions of section 166(d). Section 166(a) allows to a taxpayer a deduction for any debt which becomes worthless within the taxable year. However, in the case of a nonbusiness bad debt which becomes worthless, the resulting loss *70 is under section 166(d), [10] which gives rise to a short-term capital loss. *71 For Dr. Feinman to prevail in his position that his loss, because of the worthlessness of his loans to Little Miss, is deductible under section 166(a) as a business bad debt, he must show that his business ventures outside of his medical practice are of such a nature as to constitute a trade or business. Dr. Feinman argues that over the years he has sought and acquired numerous ventures for promoting, managing, financing, and development for sale at a profit and that therefore these activities constituted a "trade or business." Whipple v. Commissioner,373 U.S. 193 (1963), involved loans by a shareholder to one of the corporations in which he held a substantial interest. The debt became worthless and petitioner deducted the amount as a business bad debt. The Supreme Court in holding that the debts were not incurred in a trade or business of the taxpayer stated at 202-203: Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. Though such activities may produce income, profit *72 or gain in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself. When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business since investing is not a trade or business and the return to the taxpayer, though substantially the product of his services, legally arises not from his own trade or business but from that of the corporation. Even if the taxpayer demonstrates an independent trade or business of his own, care must be taken to distinguish bad debt losses arising from his own business and those actually arising from activities peculiar to an investor concerned with, and participating in, the conduct of the corporate business. If full-time service to one corporation does not alone amount to a trade or business, which it does not, it is difficult to understand how the same service to many corporations *73 would suffice. To be sure, the presence of more than one corporation might lend support to a finding that the taxpayer was engaged in a regular course of promoting corporations for a fee or commission, * * * or for a profit on their sale, * * * but in such cases there is compensation other than the normal investor's return, income received directly for his own services rather than indirectly through the corporate enterprise * * *. This Court has interpreted this language to mean that "in order for such a promoter to be engaged in a trade or business for tax purposes he must undertake such activity for 'compensation other than a normal investor's return'. Such compensation must be 'received directly for his own services rather than indirectly through the corporate enterprise'." [footnote omitted]. I. Hal Millsap, Jr.,46 T.C. 751, 756 (1966), affd. 387 F. 2d 420 (8th Cir. 1968). Also see Townshend v. United States,384 F. 2d 1008, 1012 (Ct. Cl. 1967). In this case, Dr. Feinman has made no showing apart from his own statement that he *74 acquired business ventures for promoting, organizing, managing, financing and development for sale at a profit. The record fails to support Dr. Feinman's conclusion that in fact he was engaged in the trade or business of "promoting." [11]The business ventures that Dr. Feinman undertook, which included the Baum Building, Country Garden Shopping Center, the Kalchstein Building owned by his wife and the property leased to Zayre's, all produced rental income and were managed by a real estate agency. Also all of these properties were held for a number of years until Dr. Feinman filed a voluntary petition in bankruptcy in 1968. Dr. Feinman's interests in these properties were subsequently turned over to the trustee in bankruptcy. [12] Little Miss was seized by WPNB pursuant to a default under the terms of the Deed of Trust on the corporate assets. It appears from the facts in this record that Dr. Feinman never sold any of his claimed business ventures. There is nothing in this record to indicate that Dr. Feinman ever received any commissions or broker's fees in the conduct of his activities. The activities of Dr. Feinman in connection with Little Miss were those of an investor who expended *75 much time, energy, and money attempting to turn the corporation into a successful business and also to attempt to protect money already expended in behalf of the corporation. [13] Advances motivated by the desire to protect one's own investment give rise to a nonbusiness bad debt within the meaning of section 166(d) when such loans become worthless. Therefore, we hold that the advances by Dr. Feinman to Little Miss which became worthless in 1968 were nonbusiness bad debts. *76 Dr. Rittenhouse also takes the position that he was in the trade or business of promoting, managing, financing, and developing and that for this reason the loss he incurred when the loans to Little Miss became worthless is deductible under section 166(a) as a business bad debt. As with Dr. Feinman, it is the position of respondent that Dr. Rittenhouse's activities apart from his medical practice do not constitute a trade or business within the meaning of section 166(d)(2). For the reasons stated in determining the deductibility of the loss by Dr. Feinman, we conclude that the loans made to Little Miss by Dr. Rittenhouse are nonbusiness bad debts under section 166(d). While Dr. Rittenhouse spent a great amount of time and energy with his outside activities, these activities were of an investment nature. Dr. Rittenhouse, during the period that he engaged in the activities which he contends constituted a business of "promoting," was actively engaged in the practice of medicine. Upon the sale of the oil ventures in which he had participated he reported the gain as long-term capital gain, so at that time he apparently considered that he was not actively engaged in the trade or business *77 of promoting. He sold his interest in the automobile agency because he wanted to minimize his losses. He sold his interest in a professional building in Florida, which generated rental income, because of the problem of absentee ownership. He stated that the purpose of his purchase of an island in Florida was to hold the land for appreciation. He entered into a franchise agreement on homes, but did not pursue the business because of personal reasons. He also acquired options on various parcels of land, but never exercised these options because he could interest no other investors. Dr. Rittenhouse, in the course of his activities, never received any broker's fees or commissions. He did not at any time draw a salary from any of his outside activities, including Little Miss. [14] In our view, it is clear from this record that the activities of Dr. Rittenhouse, and profit produced by them, were those of an investor. The advances to Little Miss were made with the motivation to preserve his investment of money, time, and energy in the company and to turn Little Miss into a profitable operation. *78 Both Dr. Feinman and Dr. Rittenhouse, in reaching the amount of claimed ordinary loss suffered, determined that a portion of the amount was due to the voluntary petition in bankruptcy filed by each in 1968. It is Dr. Rittenhouse's position that the following losses are deductible losses brought about by the bankruptcy: Loss on stock sold by McKeesport
National Bank due to money borrowed
by petitioner and used on behalf of
Little Miss. Stock sold subsequent
to filing petition in bankruptcy.
$31,600
Loss of home and extra lot due to pro-
moting the business of Little Miss
65,000
$96,600
Dr. Feinman maintains that he suffered a deductible loss in the amount of $203,600 caused by the filing of a voluntary petition in bankruptcy. This total is composed of the purported fair market value of the property interest he held in the Kalschstein Building, Baum Building, commercial acreage in Monroeville, his interest in the Country Gardens Shopping Center, and his personal residence. Dr. Rittenhouse, Dr. Feinman and other individual shareholders of Little Miss entered bankruptcy in voluntary petitions as the result of their agreement to personally guarantee the *79 line of credit of $1,400,000 advanced to Little Miss. They had agreed to be personally, jointly, and severally liable for the money advanced to Little Miss. Upon the default of Little Miss under the deed of trust agreement with WPNB, each of the shareholder-guarantors, with one exception, filed a voluntary petition in bankruptcy in December 1968. It is the position of petitioners that a deductible loss arose in the amount of the fair market value of their assets surrendered to the trustee in bankruptcy and subsequently sold by him. It is respondent's position that there is no tax loss whatsoever from the personal bankruptcy of petitioners and that if the sale of their assets produced a loss, the loss was to the bankrupt estate rather than the petitioners individually. Under section 70(a) of the Bankruptcy Act, 11 U.S.C. section 110, the trustee of a bankrupt's estate acquires title to all of the bankrupt's property, except exempt property, as of the date of the petition in bankruptcy. The assets turned over by these petitioners to the trustee were sold in 1969. *80 Petitioners generally argue that the loss sustained from the surrender of their assets to the trustee in bankruptcy resulting from the default of Little Miss gives rise to a deduction under section 162 as a trade or business expense or, in the alternative, as a loss under section 165. Petitioners are not entitled to a deduction under sections 162, 165 or 166 in 1968, when they claim the amount as a deduction, for two reasons. First, neither petitioner was in the trade or business of lending or promoting corporations or in the business of guaranteeing loans. The second reason is that no indebtedness of either petitioner was paid during 1968 by reason of the bankruptcy. [15] Since at best petitioners were guarantors of the debts of Little Miss, they, as cash basis taxpayers, would under no circumstances be entitled to any type of deduction for any liability on their guarantee until that liability is actually paid. Donald M. Perry,49 T.C. 508, 521, 522 (1968). No actual payment of any amount on the $1,404,500 judgment of WPNB was made in 1968. [16]
*81 Petitioners also suffered no loss under section 165. No loss deductible under section 165 is sustained by a cash basis taxpayer when he delivers his assets to the trustee in bankruptcy. Homer A. Martin, Jr.,56 T.C. 1294 (1971). Therefore, petitioners sustained no loss in 1968 by virtue of surrendering their assets to the trustee in bankruptcy. The subsequent liquidation of the assets in 1969 by sale by the trustee in bankruptcy or by sheriff's sale through permission of the trustee gives rise to no taxable gain or loss to petitioners. A trustee in bankruptcy and a bankrupt are separate taxable entities with each being required to file a separate return. NorrisBloomfield,52 T.C. 745 (1969). Neither petitioner sustained a loss in the bankruptcy proceedings upon the transfer of his assets to the trustee. The liabilities discharged in bankruptcy greatly exceed the value of the assets transferred as each individual guarantor under the deed of trust was jointly and severally liable on the total amount advanced under the line of credit extended to Little Miss, and in addition each petitioner had substantial other liabilities which were discharged. *82 Parkford v. Commissioner,133 F. 2d 249 (9th Cir. 1943), certiorari denied 319 U.S. 741 (1943). Norris Bloomfield,supra.
Section 47(a)[17] provides for recapture of investment credit upon the early disposition of section 38 property. The parties have stipulated that the section 38 property of Little Miss ceased to be such in November 1968. It is petitioners' argument that the individual shareholders should not be required to recapture the investment credit because the disposition which brought about the section 38 property ceasing to be such was caused by an involuntary disposition of the assets of the corporation through the seizure of control of the corporation by its creditors. It is respondent's position that petitioners are required to recapture the investment credit in 1968 that was claimed on their individual returns for 1965 and 1966. Respondent relies on section 1.47-4(a)(1), Income Tax Regs., [18] which provides that if a former electing small business corporation disposes of any section 38 property before the *83 close of the estimated useful life taken into account in computing the credit, a recapture determination shall be made with respect to each shareholder who is treated under section 1.48-5(a)(3), Income Tax Regs., as a taxpayer with respect to such property. [19]
*84 Both parties rely on Charbonnet v. United States,320 F. Supp. 874 (E.D. La. 1971), affd. 455 F. 2d 1195 (5th Cir. 1972). The facts in that case showed that at the time the credit was claimed by the shareholders the corporation was an electing small business corporation under sections 1371 and 1372, [20] but subsequent to that year the corporation ceased to be taxed pursuant to the provisions of Subchapter S. In a later year the taxpayers disposed of part of their interest in the corporation through a sale of some of their stock and the Court held that the taxpayers were liable for the recapture of an appropriate portion of investment credit in the year in which their stock interest was reduced below 66-2/3 percent of their interest at the date the corporation qualified for the investment credit. Section 1.47-4, Income Tax Regs.[21]
*85 Petitioners argue that their disposition of the section 38 property was not a voluntary one as was the sale of stock by the shareholders in Charbonnet and that therefore they should not be subject to recapture of the credit because there is no evidence of a "bail-out." They contend that to require recapture because of an involuntary disposition of property would frustrate the intent of Congress. [22] Although in the case before us the property ceased to be section 38 property in November 1968 due to the fact that Little Miss ceased active operation without prospect of revival, we hold that the fact that the disposition of the property was involuntary does not affect the requirement for the recapture of the investment credit. Section 47(a)(1) states that "if during any taxable year any property is disposed of, or otherwise ceases to be section 38 property with respect to the taxpayer, * * *" the recapture shall apply. [Emphasis supplied.] In our view this language is applicable to the facts in this case. There is no indication of any intent that the recapture provision be limited *86 to voluntary dispositions. In Henry C. Mueller,60 T.C. 36, 46-47 (1973) affd. in part, reversed in part, and remanded on another issue, 496 F. 2d 899 (5th Cir. 1974), which involved a taxpayer we held to be required to recapture investment credit when his assets were turned over to a trustee in bankruptcy pursuant to a voluntary petition in bankruptcy, we stated that the Senate Finance Committee report includes the following language: "In general, property will be considered disposed of whenever it is sold, exchanged, transferred, distributed, involuntarily converted, or disposed of by gift. (S. Rep. No. 1881, 87th Cong., 2d Sess., 1962-3 C.B. 852-853)." We hold that the involuntary disposition of property by its surrender pursuant to a default of a deed of trust agreement fits within the intent of section 47. Here, because of petitioners *87 having received the benefit of the credit, the recapture is to be from them and not from the bankrupt estate. See Henry Mueller,supra, at 47. Dr. Feinman is required to add to his 1968 tax, as otherwise computed, the amount of $9,052.89 because of his prior taking of investment credit with respect to assets of Little Miss which ceased to be used in 1968; and Dr. Rittenhouse is required, for the same reason, to add to his 1968 tax, as otherwise computed, the amount of $4,035.15. Decisions will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated.↩
2. Emory A. Rittenhouse was legally separated and divorced from Ellen C. Rittenhouse during 1972. Ellen C. Rittenhouse is not a party to this proceeding.↩
3. The validity of the judgment was upheld on the subsequent attack of one of the guarantors. However, the attorney's fee was reduced from $210,000 to $4,500, leaving a total judgment of $1,404,500.↩
4. The corporate minutes of Little Miss were not produced at the trial. At some point subsequent to the entry of a confession of judgment against the guarantors under the line of credit advanced to Little Miss, WPNB padlocked the premises of Little Miss. Mr. Sallows, a WPNB adjustment officer, was subpoenaed during the trial and did appear. He stated that he had no personal knowledge of the records in question and that a prior officer of the bank, now retired, or the attorney for WPNB might know if such records existed. The parties stipulated that if the attorney were called to appear he would testify that he had no knowledge of whether Equibank (WPNB) ever had possession of the corporate minute book, but a review of two boxes of documents and records in possession of the bank at Pittsburgh, Pennsylvania on January 30, 1975, revealed no corporate records of Little Miss. The retired bank officer was never called as a witness and the accountant, who other witnesses testified suggested the sec. 1244↩ plan and drafted a proposed plan, was not called as a witness, and no adequate explanation was given for failure to call him. No evidence was introduced of any search for records of Little Miss at any branch of WPNB except the office in Pittsburgh.
5. The assets were taken over pursuant to the deed of trust provisions and sold with the approval of the trustee in bankruptcy.↩
*. The correct figure for this item as stipulated by the parties is $11,385.18.↩
*. The parties have stipulated that Dr. Feinman's basis in Little Miss as of July 1, 1966, is zero, the termination date of the Subchapter S election of Little Miss.↩
6. SEC. 1244. LOSSES ON SMALL BUSINESS STOCK. (a) General Rule.--In the case of an individual, a loss on section 1244 stock issued to such individual or to a partnership which would (but for this section) be treated as a loss from the sale or exchange of a capital asset shall, to the extent provided in this section, be treated as a loss from the sale or exchange of an asset which is not a capital asset. (b) Maximum Amount for Any Taxable Year.--For any taxable year the aggregate amount treated by the taxpayer by reason of this section as a loss from the sale or exchange of an asset which is not a capital asset shall not exceed-- (1) $25,000, or (2) $50,000, in the case of a husband and wife filing a joint return for such year under section 6013↩.
7. SEC. 1244. LOSSES ON SMALL BUSINESS STOCK. * * *
(c) Section 1244 Stock Defined.-- (1) In general.--For purposes of this section, the term "section 1244 stock" means common stock in a domestic corporation if-- (A) such corporation adopted a plan after June 30, 1958, to offer such stock for a period (ending not later than two years after the date such plan was adopted) specified in the plan, (B) at the time such plan was adopted, such corporation was a small business corporation, (C) at the time such plan was adopted, no portion of a prior offering was outstanding, (D) such stock was issued by such corporation, pursuant to such plan, for money or other property (other than stock and securities), and (E) such corporation, during the period of its 5 most recent taxable years ending before the date the loss on such stock is sustained (or if such corporation has not been in existence for 5 taxable years ending before such date, during the period of its taxable years ending before such date, or if such corporation has not been in existence for one taxable year ending before such date, during the period such corporation has been in existence before such date), derived more than 50 percent of its aggregate gross receipts from sources other than royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities (gross receipts from such sales or exchanges being taken into account for purposes of this subparagraph only to the extent of gains therefrom); except that this subparagraph shall not apply with respect to any corporation if, for the period referred to, the amount of the deductions allowed by this chapter (other than sections 172, 242, 243, 244, and 245) exceed the amount of gross income. Such term does not include stock if issued (pursuant to the plan referred to in subparagraph (A)) after a subsequent offering of stock has been made by the corporation.↩
8. None of the written documents, which petitioner offered as purported secondary evidence of records of Little Miss, contained any purported written plan under sec. 1244. The lawyer for Little Miss testified that "the plan" which he thought but did not actually remember as being adopted was furnished to him by an accountant. This accountant was not called as a witness. There is other evidence in the record suggesting that the accountant supplied the information as to the suggested "written plan" in the latter part of 1968, not of 1967. There is also some indication in the record that the adoption of a "section 1244↩" plan was considered in the latter part of 1966 rather than of 1967. No adequate explanation was offered for petitioners' failure to call the accountant and have him produce his records.
9. The manner in which petitioners reported their claimed losses on their income tax returns is a further indication of a lack of knowledge of the detailed requirements of section 1244. Both Dr. Feinman and Dr. Rittenhouse deducted the full amount of the loss they claimed they had sustained as an ordinary loss under section 1244, with apparently no knowledge of the limitation provisions of section 1244(b)↩.
*. Respondent maintains that $25.63 of the total claimed under the miscellaneous heading has been substantiated, but the remaining $655 has not been adequately accounted for.↩
10. SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly worthless debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts.--When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * *
(d) Nonbusiness Debts.-- (1) General rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
11. We also note that upon filing his voluntary petition in bankruptcy in December 1968 Dr. Feinman in the Statement of Affairs filed with the bankruptcy proceedings answered "no" to the following question: "Have you been in partnership with anyone, or engaged in any business, during the six years immediately preceding the filing of the original petition herein." He stated that his occupation was that of an optometrist. ↩
12. The only asset this record shows Dr. Feinman sold was land adjacent to Little Miss which was transferred to the corporation. ↩
13. It has been held in some situations that the advances to a corporation which become worthless may give rise to an ordinary loss deduction where the taxpayer is attempting to protect the salary that he receives from such corporation and that the advances were for that purpose. See United States v. Generes,405 U.S. 93 (1972) and Trent v. Commissioner,291 F. 2d 669↩ (2d Cir. 1961). Such is not the situation before us. Dr. Feinman did not at any time receive a salary from Little Miss. There is some evidence that the corporation may have planned at a later date when it operated successfully to pay salaries to Dr. Feinman and Dr. Rittenhouse but this evidence is inconclusive.
14. We note that as in the case of Dr. Feinman, Dr. Rittenhouse upon filing his voluntary petition in bankruptcy in December 1968, in the Statement of Affairs filed with the bankruptcy proceedings also answered in the negative to the question: "Have you been in partnership with anyone, or engaged in any business, during the six years immediately preceding the filing of the original petition herein." He stated that his occupation was that of a physician.↩
15. We are aware that the year 1969 is also before us. It appears to us from the opinion of the Court of Common Pleas of Allegheny County, Pennsylvania, recorded October 22, 1969, which is an exhibit in this case, that assets of Dr. Feinman and Dr. Rittenhouse surrendered to the trustee in bankruptcy may have been in part used in 1969 to discharge their liability to WPNB in connection with their agreement of liability for the $1,400,000 advance to Little Miss. Apparently assets of a total fair market value of $107,792 of Dr. Feinman, Dr. Rittenhouse, their wives, and three other stockholders of Little Miss and two of their wives, were transferred by the trustee pursuant to a sheriff's sale to WPNB in partial discharge of the liability of these stockholders on the judgment of $1,404,500 and a deficiency judgment entered for the balance after notation with respect to the bankruptcy of the individuals. Whether any portion of this $107,792 could be considered as a payment by Dr. Feinman and Dr. Rittenhouse on a guarantee of an indebtedness of Little Miss, we need not decide. If it were, this amount would be subject to the treatment of a loss on a nonbusiness bad debt. Putnam v. Commissioner,352 U.S. 82↩ (1956). Any such capital loss in 1969 would have no effect on the tax liability of either petitioner for the years before us since each had more capital loss carryover to 1969 than was usable under sections 1211 and 1212. Certainly if petitioners are by their argument contending for a capital loss in 1969 as a result of some use of their assets by the trustee in bankruptcy, they should have shown the amount of this loss and explained how it arose and why it was allowable. This they have not done. 16. On brief petitioners have argued that respondent cannot properly raise the defense of bankruptcy for the first time upon brief to deny the deduction of the loss and cites us to Rule 36(b) of the Tax Court Rules of Practice and Procedure.Petitioners are mistaken in their position. The portion of Rule 36(b) relied on by petitioners applies to a situation where respondent has the burden of proof, which is not the case before us. The determination of a deficiency by respondent is presumed to be correct and petitioner has the burden of proof to show the determination is incorrect. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933). It has long been the law that in order to be entitled to a deduction a taxpayer must show that he comes within the statutory provision allowing the deduction. New Colonial Ice Co. v. Helvering,292 U.S. 435↩ (1934).
17. SEC. 47. CERTAIN DISPOSITIONS, ETC., OF SECTION 38 PROPERTY. (a) General Rule.--Under regulations prescribed by the Secretary or his delegate-- (1) Early disposition, etc.--If during any taxable year any property is disposed of, or otherwise ceases to be section 38 property with respect to the taxpayer, before the close of the useful life which was taken into account in computing the credit under section 38, then the tax under this chapter for such taxable year shall be increased by an amount equal to the aggregate decrease in the credits allowed under section 38 for all prior taxable years which would have resulted solely from substituting, in determining qualified investment, for such useful life the period beginning with the time such property was placed in service by the taxpayer and ending with the time such property ceased to be section 38 property. * * *↩
18. Sec. 1.47-4(a)(1) Inc. Tax Regs., provides in part: Sec. 1.47-4. Electing small business corporation. (a) In general--(1) Disposition or cessation in hands of corporation. If an electing small business corporation (as defined in section 1371(b)) or a former electing small business corporation disposes of any section 38 property (or if any section 38 property otherwise ceases to be section 38 property in the hands of the corporation) before the close of the estimated useful life which was taken into account in computing qualified investment with respect to such property, a recapture determination shall be made with respect to each shareholder who is treated, under section 1.48-5↩, as a taxpayer with respect to such property. * * * 19. Sec. 1.48-5(a)(3), Inc. Tax Regs., provides in part: * * * If a shareholder takes into account in determining his qualified investment any portion of the basis (or cost) of section 38 property placed in service by an electing small business corporation and if such property subsequently is disposed of or otherwise ceases to be section 38 property in the hands of the corporation, such shareholder shall be subject to the provisions of section 47↩. * * *
20. The investment credit was then passed through to the shareholders by virtue of section 48(e) which provides: (e) Subchapter S Corporations.--In the case of an electing small business corporation (as defined in section 1371)-- (1) the qualified investment for each taxable year shall be apportioned pro rata among the persons who are shareholders of such corporation on the last day of such taxable year; and (2) any person to whom any investment has been apportioned under paragraph (1) shall be treated (for purposes of this subpart) as the taxpayer with respect to such investment, and such investment shall not (by reason of such apportionment) loss its character as an investment in new section 38 property or used section 38↩ property, as the case may be. 21. Also see Estate of C. A. Diecks, 65 T.C. (Oct. 23, 1975), where we approved the result reached in Charbonnet.↩
22. Petitioners in their argument apparently are relying on the statement made by the Fifth Circuit that: "Congress was evidently concerned with the abuse of the [investment] credit by shareholders bailing out prematurely." Charbonnet v. United States,455 F. 2d 1195, 1199↩ (1972).